IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

FIRST BAPTIST CHURCH;
PASTOR STEPHEN ORMORD;
CALVARY BAPTIST CHURCH; and
PASTOR AARON HARRIS,

        Plaintiffs,

v.                                                  No. 20-1102-JWB

GOVERNOR LAURA KELLY,
*in her official capacity,*

        Defendant.

**MEMORANDUM AND ORDER**

This matter is before the court on Plaintiffs' "Motion for Expedited Hearing and Motion for Temporary Restraining Order." (Doc. 7.) The motion was filed in conjunction with Plaintiffs' verified complaint (Doc. 1), which alleges that enforcement of restrictions on religious activity in Defendant Governor Laura Kelly's Executive Order ("EO") 20-18 would violate Plaintiffs' rights, including their First Amendment right to the free exercise of religion. The complaint seeks declaratory and injunctive relief pursuant to 42 U.S.C. § 1983, as well as relief under state law. The court held a telephonic hearing on the motion for temporary restraining order ("TRO") on April 17, 2020, at 4:00 p.m.

Prior to the hearing, Defendant filed a motion to dismiss, arguing the claims are moot because Governor Kelly signed EO 20-25 on April 17, 2020. (Doc. 9.) EO 20-25 alters some of the state-imposed restrictions on public activities, and it states in part that EO 20-18 "is rescinded

and replaced by this order" as of the effective date of April 18, 2020, at 12:01 p.m." (Doc. 9-2 at 5.)

For the reasons stated herein, Defendant's motion to dismiss (Doc. 9) is DENIED and Plaintiffs' motion for a temporary restraining order (Doc. 7) is GRANTED.

The Governor has issued a series of executive orders imposing restrictions on numerous public and private activities in light of the COVID-19 pandemic. For example, on March 17, 2020, the Governor signed EO 20-04, which among other things prohibited "mass gatherings" in the State of Kansas. The term was defined to include any public or private convening that brings together 50 or more people in a confined or enclosed space. The prohibition was expressly applied to mass gatherings at auditoriums, theaters, stadiums, and a number of other venues. The order contained a substantial list of activities or facilities that were exempt from the prohibition, including "Religious gatherings, as long as attendees can engage in appropriate social distancing." Another order issued the same day (EO 20-07) closed public and private schools in Kansas. On March 24, 2020, the Governor issued EO 20-14, which prohibited mass gatherings of more than 10 people. The exemption for religious gatherings was maintained intact "as long as attendees can engage in appropriate social distancing." Also, on March 24, 2020, the Governor issued EO 20-15 establishing the Kansas Essential Functions Framework ("KEFF"), which identified essential functions that must be exempted from any "stay-at-home" order issued by local authorities. The essential functions identified in the order included a wide array of things, including "Preserve Constitutional Rights."

On March 27, 2020, the Governor signed EO 20-16, which adopted a statewide "stay-at-home" order directing all Kansas citizens to stay at home unless they were performing "an essential activity." (Doc. 1-3 at 3.) The order exempted individuals performing listed essential functions

2

from the prohibitions in the order, although it still required them, to the extent possible without significant disruption to essential functions, to use tele-working or, if meeting in person, to follow appropriate safety protocols, including maintaining a 6-foot distance between individuals. (*Id.* at 5.) The order restated and refined the KEFF essential functions. The essential function of preserving constitutional rights was expanded to include several items, including "Perform or attend religious or faith-based services or activities." (*Id.* at 7.)

On April 7, 2020, five days before Easter, the Governor issued EO 20-18. It found enhanced measures were needed to slow the spread of COVID-19, and it made certain changes to existing prohibitions. In the provision listing venues to which the prohibition on "mass gatherings" applies, the order included for the first time "churches or other religious facilities" among the previously listed auditoriums, theaters, stadiums, and other venues. The order then adopted the following specific restriction on religious activities:

> With regard to churches or other religious services or activities, this order prohibits gatherings of more than ten congregants or parishioner in the same building or confined or enclosed space. However, the number of individuals – such as preachers, lay readers, choir or musical performer, or liturgists – conducting or performing a religious service may exceed ten as long as those individuals follow appropriate safety protocols, including maintaining a six-foot distance between individuals and following other directive regarding social distancing, hygiene, and other efforts to slow the spread of COVID-19.

(Doc. 1-1 at 3.) The order restricted a number of other activities as well, but it also maintained a long list of activities and facilities that were exempt from the prohibitions in the order. The exempted activities and facilities included most governmental operations. The list of exemptions also included, among others: airports; childcare locations; hotels; food pantries and shelters; detoxification centers; shopping malls "and other retails establishments where large numbers of people are present but are generally not within arm's length of one another for more than 10 minutes"; libraries; restaurants, bars, and retail food establishments (including grocery stores),

3

provided social distancing of 6 feet was maintained; office spaces; "manufacturing, processing, distribution, and production facilities"; public transportation; and job centers.

Plaintiffs filed this action on April 16, 2020, after sending a letter to the Governor asking that allowance be made for churches to hold in-person worship services provided the congregants follow rigorous social-distancing and safety protocols applicable to similar secular facilities. (Doc. 1 at 5.) The Governor's counsel responded that the matter was under review and that an order would be issued soon. (*Id.*) On April 17, 2020, the Governor signed EO 20-25, which did not alter the restriction on religious activities, but which removed certain items (such as libraries) from the exempted functions or facilities, and it placed additional restrictions on some of the exempted activities. Among other things, it limited the exemption for retail establishments where large numbers of people were present to customers and employees that are "performing essential activities or essential functions under Executive Order 20-16." Restaurants and bars were limited to no more than ten customers in the building, who must maintain a six-foot distance, but it allowed the number of persons operating the facility to exceed ten if they maintained safety protocols. Office spaces were still exempt but were limited to those "performing essential activities or functions as described and limited by Executive Order 20-16." (Doc. 9-2.)

**I. Jurisdiction**

This court has subject matter jurisdiction over Plaintiffs' claims arising under federal law pursuant to 28 U.S.C. § 1331. The court further finds the exercise of this court's jurisdiction over such claims is proper under the rule of *Ex Parte Young,* 209 U.S. 123 (1908) (plaintiff alleging violation of federal law may seek prospective injunctive relief against responsible state official).[1] As for Defendant's mootness argument, the court finds Plaintiffs' claims are not moot. Mootness

---

[1] This order is premised solely on Plaintiffs' federal law claims and does not consider Plaintiffs' claim that enforcement of Executive Order 20-18 violates Kansas law. (Doc. 1 at 14-15.)

is a threshold issue because the existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction. *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1109 (10th Cir. 2010) (citation omitted.) "Article III's requirement that federal courts adjudicate only cases and controversies necessitates that courts decline to exercise jurisdiction where the award of any requested relief would be moot—i.e. where the controversy is no longer live and ongoing." *Cox v. Phelps Dodge Corp.*, 43 F.3d 1345, 1348 (10th Cir. 1994), *superseded by statute on other grounds*. In this instance, the controversy between the parties is ongoing, as the restrictions on religious activities in newly executed EO 20-25 (Doc. 9-2) are identical to the restrictions on religious activities found in EO 20-18, which formed the basis of the complaint. Plaintiffs have made a sufficient showing that a live controversy exists as to whether the Governor's current restrictions on religious activity – found in both EO 20-18 and EO 20-25 – violate Plaintiffs' First Amendment right to freely exercise their religion. The court thus concludes that it has jurisdiction over the dispute, and that Defendant's motion to dismiss on mootness grounds (Doc. 9) should be denied.

**II. Standards for issuance of a TRO**

When addressing a motion for temporary restraining order, the court applies the same standard as it applies to a motion for preliminary injunction. Four factors must be shown by the movant to obtain injunctive relief: (1) the movant is substantially likely to succeed on the merits; (2) the movant will suffer irreparable injury if the injunction is denied; (3) the movant's threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction is in the public interest. Because a preliminary injunction is an extraordinary remedy, the movant's right to relief must be clear and unequivocal. *Tickets for Less, LLC v. Cypress Media, LLC*, No. 20-2047-JAR-GEB, 2020 WL 528449, at *2 (D. Kan. Feb. 3, 2020). *See also Winter v.*

*Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "Additionally, some preliminary injunctions are disfavored and require a stronger showing by the movant—viz., movants must satisfy a heightened standard. They are '(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits.'" *Fish v. Kobach*, 840 F.3d 710, 723–24 (10th Cir. 2016) (citation omitted.) "In seeking such an injunction, the movant must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Id.* (citation and internal quotation marks omitted.)

### III. Analysis

A. <u>Status quo</u>. Defendant argued at the hearing that Plaintiffs' requested TRO should be denied because it would alter the status quo. The "status quo" in this context refers to "the last peaceable uncontested status existing between the parties before the dispute developed." *Hobby Lobby Stores, Inc. v. Sebelius*, No. 12-6294, 2012 WL 6930302, at *1 (10th Cir. Dec. 20, 2012) (citing *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1071 (10th Cir. 2009)). The last peaceable uncontested status between the parties was just prior to the enactment of EO 20-18, the first order which subjected Plaintiffs to the current restrictions on religious activities. Because the requested TRO would return the parties to that uncontested status, it would not alter the status quo and is not a disfavored injunction. *See Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 798 (10th Cir. 2019) (the status quo was the parties' status before the challenged ordinance was adopted.)

B. <u>Likelihood of success on the merits</u>.

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show the deprivation of a federal right by a person acting under color of state law. The First Amendment provides in part

that "Congress shall make no law … prohibiting the free exercise" of religion. U.S. Const. amend. I. The First Amendment applies to the States by virtue of the Fourteenth Amendment. *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 301 (2000). Plaintiffs claim, among other things, that the restrictions on religious activity imposed by EO 20-18 (and now 20-25) violate Plaintiffs' First Amendment right to freely exercise their religion, including their right to attend worship services in their respective church facilities. For reasons that follow, the court concludes, based on the matters presented so far, that Plaintiffs are likely to prevail on this claim.

      i. *Standard of review*. The parties dispute the standard that applies to the court's review of the Governor's executive orders. At the hearing on the TRO, Defendant asserted that these executive orders are not subject to heightened scrutiny because they do not target religious activity, but instead apply broadly to a large swath of both secular and non-secular behavior. The court assumes Defendant is suggesting that this case is controlled by the less rigorous standards for review set forth in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990). However, *Smith* was an unemployment case in which the plaintiff was denied unemployment benefits because he was fired for violating a generally applicable statute criminalizing the use of peyote, a hallucinogenic drug. Smith claimed that the government's decision violated his rights under the Free Exercise Clause of the First Amendment. *Id.* at 874.

      The statute at issue in *Smith* was a facially neutral law that criminalized the use of certain drugs that was "not specifically directed at [Smith's] religious practice, and that is concededly constitutional as applied to those who use the drug for other reasons." *Id.* at 878. The Supreme Court stated that it has never excused an individual "from compliance with an otherwise valid law *prohibiting conduct that the State is free to regulate*." *Id.* at 879 (emphasis added). But the executive orders at issue in this case expressly restrict religious activity. Indeed, a fair reading of

7

EO 20-18 and EO 20-25 shows that they operate as a wholesale prohibition against assembling for religious services anywhere in the state by more than ten congregants. While it is unclear at this stage of the proceedings exactly how many churches may be impacted by that proscription, it is fair to say that these executive orders will likely impact the majority of churches and religious groups in Kansas. Thus, EO 20-18 and EO 20-25 sweep far beyond the "incidental effect" on religious activity excused in *Smith*. *Id.*; *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) (noting *Smith's* application to incidental burdening of particular religious practices).

At the TRO hearing, Defendant also relied heavily on *In re Abbott*, No. 20-50264, 2020 WL 1685929 (5th Cir. Apr. 7, 2020), a case recently decided by the Fifth Circuit. In *Abbott*, the Fifth Circuit upheld an executive order issued by the governor of Texas that required healthcare providers to postpone non-essential surgeries and procedures during the COVID-19 pandemic in order to conserve critical medical resources and otherwise curb the spread of coronavirus infection. Plaintiffs in that case claimed that the executive order infringed the constitutional right to abortion. However, unlike the present case, the executive order at issue in *Abbott* made no mention of abortion or other constitutionally protected activity. *Id*. at *3.

*Abbott* relied heavily on *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), a case challenging a Massachusetts law that mandated smallpox vaccinations when the state was battling that disease. *Abbott* quoted *Jacobson* for propositions such as "'[U]nder the pressure of great dangers,' constitutional rights may be reasonably restricted 'as the safety of the general public may demand'" *Abbott* at *1 (quoting *Jacobson* 197 U.S. at 29); "[b]ut '[i]t is no part of the function of a court' to decide which measures are 'likely to be the most effective for the protection of the public against disease'" *Id*. (quoting *Jacobson*, 197 U.S. at 30); and

8

> [I]n every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand.

*Id*. at *6 (quoting *Jacobson*, 197 U.S. at 29). *Abbott* concluded its analysis, as relevant here, as follows:

> The bottom line is this: when faced with a society-threatening epidemic, a state may implement emergency measures that curtail constitutional rights so long as the measures have at least some "real or substantial relation" to the public health crisis and are not "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." [*Jacobson*, 197 U.S.] at 31, 25 S. Ct. 358. Courts may ask whether the state's emergency measures lack basic exceptions for "extreme cases," and whether the measures are pretextual—that is, arbitrary or oppressive. *Id.* at 38, 25 S. Ct. 358. At the same time, however, courts may not second-guess the wisdom or efficacy of the measures. *Id*. at 28, 30, 25 S. Ct. 358.

*Id.* at *7.

*Abbott's* reliance on *Jacobson* counsels further analysis of that case. *Jacobson*, like *Abbott*, involved a facially neutral law, which required vaccination for smallpox. The issue in that case did not involve the free exercise of religion, but rather a claim that the law invaded an individual's liberty "to care for his own body and health in such way as to him seems best," as protected by the Fourteenth Amendment. *Jacobson*, 197 U.S. at 26. And although it did not deal with a question of religious liberty, *Jacobson* appears more in line with *Smith* in the sense that law at issue in *Jacobson* did not expressly purport to interfere with rights secured by the Constitution. In concluding that no constitutional violation occurred under the Massachusetts law, *Jacobson* said,

> Smallpox being prevalent and increasing at Cambridge, the court would usurp the functions of another branch of government if it adjudged, as matter of law, that the mode adopted under the sanction of the state, to protect the people at large was arbitrary, and not justified by the necessities of the case. We say necessities of the case, because it might be that an acknowledged power of a local community to protect itself against an epidemic threatening the safety of all might be exercised in particular circumstances and in reference to particular persons in such an arbitrary, unreasonable manner, or might go so far beyond what was reasonably required for the safety of the public, as to authorize or compel the courts to interfere for the protection of such persons.

*Id.* at 28. Importantly, the second sentence of the foregoing quote points out that, even in such extreme cases as a public health crisis, the police power of the state is not without limits, and is subject to appropriate judicial scrutiny. And,

> if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.

*Id.* at 28.

At the TRO hearing, both sides argued most extensively about the application of the Supreme Court's decision in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). In that case, the City of Hialeah passed several facially neutral ordinances aimed at curbing the practice of animal sacrifice that was central to the religious practice of the Santeria religion. The Church of the Lukumi Babalu Aye, Inc., and its congregants practiced the Santeria religion and had recently announced plans to establish a church facility in Hialeah, Florida. Shortly thereafter, Hialeah's city council called an emergency meeting and began enacting a series of ordinances that prohibited animal sacrifices and animal cruelty, and threatened those who violated the ordinances with criminal prosecution. The ordinances purported to extend these prohibitions to the killing of animals for food, but then carved out exemptions for slaughterhouses and other licensed establishments that killed animals for food purposes. *Lukumi,* 508 U.S. at 528. The Supreme Court ultimately concluded that the object of these ordinances was to target the Santeria church members. *Id.* at 535.

The Court began its analysis of the claims in *Lukumi* with the proposition from *Smith* that "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Id.* at 531. However, "if the object of a law is to infringe upon or restrict practices

10

because of their religious motivation, the law is not neutral, . . . and it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." *Id*. at 533. The neutrality analysis begins with the text of the law, itself, and the law "lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Id*.

In this case, EO 20-18 and EO 20-25 expressly purport to restrict in-person religious assembly by more than ten congregants. In that sense, they are not facially neutral. Defendant asserts that despite the express restrictions imposed on religious assembly, the laws are facially neutral because they apply as well to a much broader swath of secular activity in addition to the overt limitations placed on church gatherings. Nevertheless, while these executive orders begin with a broad prohibition against mass gatherings, they proceed to carve out broad exemptions for a host of secular activities, many of which bear similarities to the sort of personal contact that will occur during in-person religious services. *Lukumi* indicates that a court should evaluate these exemptions in assessing a law's neutrality. *See Lukumi*, 508 U.S. at 535-37.

The court pauses its analysis at this point to circle back to the initial question of what standard is to be applied in evaluating Plaintiffs' claims under the Free Exercise Clause. Unsurprisingly, the parties have failed to identify any controlling authority for evaluating a wholesale prohibition on in-person religious services like that at issue in this case. Under ordinary circumstances, it goes without saying that the government could not lawfully expressly prohibit individuals from meeting together for religious services. Accordingly, the leading cases tend to address facially neutral laws that burden religious beliefs, or restrictions that explicitly or implicitly target particular religious groups or practices. Based on the relatively unique circumstances herein presented, the court concludes that *Smith*, *Abbott*, *Jacobson*, and similar

11

cases do not provide the best framework in which to evaluate the Governor's executive orders because all those cases deal with laws that are facially neutral and generally applicable.

The court concludes that *Lukumi*, though not identical, provides the most appropriate framework to evaluate this case. The ordinances at issue in *Lukumi*, though facially neutral in some respects, contained elements that were clearly targeted at religious practices, such as the prohibitions on ritual sacrifices. And although *Lukumi* dealt with laws that the Court concluded were ultimately aimed at a particular religious group, the court does not think that the Supreme Court would have excused the First Amendment violations in that case if the offending provisions had been part of a broader set of laws that did nothing to diminish the religious animus that was both explicit and implicit in the provisions targeting the church. Based on the foregoing reasoning, the court will evaluate Plaintiffs' claims under the Free Exercise Clause according to the principles set forth in *Lukumi*.

"At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Lukumi*, 508 U.S. at 532. "A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Id.* at 533.

In evaluating neutrality, courts are admonished to "survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders,"[2] *Lukumi*, 508 U.S. 534, and, in particular, to consider in that context exceptions or exemptions granted to secular activity that are not extended to religious activity. *See id.* at 535-37. When "individualized

---

[2] At the TRO hearing, the court indicated it did not perceive that this was necessarily a religious gerrymandering case. However, upon further analysis, the principles explained in *Lukumi* indicate that the court should consider the effect of the exemptions in these executive orders when evaluating neutrality.

exemptions from a general requirement are available, the government 'may not refuse to extend that system to cases of 'religious hardship' without compelling reason.'" *Id*. at 537 (quotation omitted).

In addition to neutrality, the Free Exercise Clause requires that "laws burdening religious practice must be of general applicability." *Lukumi*, 508 U.S. at 542. "The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause." *Id*. at 543. A law is underinclusive, and thus not generally applicable, when it fails to prohibit secular activity that endangers the same interests to a similar or greater degree than the prohibited religious conduct. *Id*.

A law that fails to satisfy the requirements of neutrality and general applicability is subjected to strict scrutiny. *Id*. at 546. "To satisfy the commands of the First Amendment, a law restrictive of religious practice must advance interests of the highest order and must be narrowly tailored in pursuit of those interests." *Id*. (internal quotations omitted). When "[t]he proffered objectives are not pursued with respect to analogous non-religious conduct, and those interests could be achieved by narrower ordinances that burdened religion to a far lesser degree," a lack of narrow tailoring invalidates the law. *Id*.

ii. *Application to this Case*.

EO 20-18 and EO 20-25 both state that their prohibitions against mass gatherings apply to "churches or other religious facilities." (EO 20-18 ¶1.b; EO 20-25 ¶1.b). Both orders expressly state in their respective paragraphs 1.c that "[w]ith regard to churches or other religious services or activities, this order prohibits gatherings of more than ten congregants or parishioners in the same building or confined or enclosed space [with exceptions for additional individuals conducting

13

the service]." These provisions show that these executive orders expressly target religious gatherings on a broad scale and are, therefore, not facially neutral.

Given the circumstances, Plaintiffs have made a substantial showing that development of the current restriction on religious activities shows religious activities were specifically targeted for more onerous restrictions than comparable secular activities. The Governor previously designated the attendance of religious services as an "essential function" that was exempt from the general prohibition on mass gatherings. That designation has not been rescinded or modified, yet in EO 20-18 and EO 20-25 churches and religious activities appear to have been singled out among essential functions for stricter treatment. It appears to be the only essential function whose core purpose – association for the purpose of worship – had been basically eliminated.[3] For example, the secular facilities that are still exempt from the mass gathering prohibition or that are given more lenient treatment, despite the apparent likelihood they will involve mass gatherings, include airports, childcare locations, hotels, food pantries and shelters, detoxification centers, retail establishments (subject to the distancing and "essential function" purpose noted above), retail food establishments, public transportation, job centers, office spaces used for essential functions, and the apparently broad category of "manufacturing, processing, distribution, and production facilities." As Plaintiffs point out, the exemption for office spaces is broad enough to include such activities as providing real estate services.

The legitimate health and safety concerns arising from people attending religious services inside a church would logically be present with respect to most if not all these other essential

---

[3] As Defendant points out, restaurants and bars were subjected to increased restrictions in EO 20-25, including the prohibition on mass gatherings. The order adopted an exemption that allowed the number of employees operating such facilities to exceed ten, provided they maintained safety protocols. (Doc. 9-2 at 4.) This restriction is arguably comparable to the restriction imposed on religious activity, but it appears to be the only essential function other than religious activities on which such a restriction was imposed. The order allows restaurant and bar facilities to continue takeout and delivery services.

activities. Defendant has not argued that mass gatherings at churches pose unique health risks that do not arise in mass gatherings at airports, offices, and production facilities. Yet the exemption for religious activities has been eliminated while it remains for a multitude of activities that appear comparable in terms of health risks. Based on the record now before the court, the most reasonable inference from this disparate treatment is that the essential function of religious activity was targeted for stricter treatment due to the nature of the activity involved, rather than because such gatherings pose unique health risks that mass gatherings at commercial and other facilities do not, or because the risks at religious gatherings uniquely cannot be adequately mitigated with safety protocols.[4] It is also an arbitrary distinction, in the sense that the disparity has been imposed without any apparent explanation for the differing treatment of religious gatherings. These facts undermine Defendant's contentions and lead the court to conclude that EO 20-18 and EO 20-25 are not neutral laws of general applicability. Instead, they restrict religious practice while failing to "prohibit secular activity that endangers the same interests to a similar or greater degree." As such, the restriction is likely subject to strict scrutiny, and can be sustained only if it is narrowly tailored to further the compelling state interest in slowing or halting the spread of COVID-19.

On the current record, Plaintiffs are likely to prevail on their assertion that the restriction on religious mass gatherings is not narrowly tailored. Specifically, Plaintiffs point to a number of other secular mass gathering activities or locations that merely require certain safety protocols, including social distancing. Given the similarities of physical proximity between these "essential" secular gathering and Plaintiffs' religious gatherings (which are also deemed essential under EO 20-16), the court finds that Plaintiffs can likely show that the broad prohibition against in-person

---

[4] At the TRO hearing, it was represented that a total of 35 COVID-19 clusters have been identified in Kansas, with 5 of those being attributable to churches. It was also represented that 13 of the clusters resulted at private companies, including a recent increase of 9 such clusters. No information was presented as to whether the clusters involving churches arose with or without the use any safety protocols such as social distancing.

15

religious services of more than ten congregants is not narrowly tailored to achieve the stated public health goals where the comparable secular gatherings are subjected to much less restrictive conditions. For that reason, and for the reasons previously stated, Plaintiffs have shown they are likely to succeed on the merits of their claim alleging a violation of their First Amendment right to the free exercise of religion.

      C. <u>Irreparable harm</u>. To obtain a TRO, Plaintiffs must show they will suffer irreparable harm in the absence of the order. *Winter*, 555 U.S. at 20. The Supreme Court has recognized that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976). Plaintiffs have alleged that without a TRO, they will be prevented from gathering for worship at their churches this Sunday, April 19, 2020 and thereafter. The court concludes Plaintiffs have made a sufficient showing of irreparable harm.

      D. <u>Balance of the equities</u>. Plaintiffs must also show that the balance of equities tips in their favor. *Winter,* 555 U.S. at 20. Plaintiffs have shown that they will be harmed by a deprivation of the constitutional right to freely exercise their religion, and that they face a threat of criminal penalties if they violate the current restrictions in EO 20-25. The court recognizes that the current pandemic presents an unprecedented health crisis in Kansas, and in this country. The Governor has an immense and sobering responsibility to act quickly to protect the lives of Kansans from a deadly epidemic. The court would not issue any restraint, temporary or otherwise, if the evidence showed such action would substantially interfere with that responsibility. Plaintiffs have shown, however, that they are willing to abide by protocols that have been determined by the Governor to be adequate to protect the lives of Kansans in the context of other mass gatherings. In view of that, and in view of the fact that a preliminary injunction hearing has been promptly scheduled for

April 23, 2020, the court concludes that the balance of equities weighs in favor of granting a TRO, pending the preliminary injunction hearing, to permit Plaintiffs to engage in worship services under the conditions stated in this order.

E. <u>Public interest</u>. Lastly, to obtain a TRO, Plaintiffs must show that the granting of a TRO is in the public interest. *Winter,* 555 U.S. at 20. The public interest is furthered by preventing the violation of a party's constitutional rights. *Free the Nipple,* 916 F.3d at 807. Additionally, for the reasons previously mentioned, the record shows that allowing Plaintiffs to gather for worship with the safety protocols similar to those applicable to other essential function mass gatherings is consistent with the interest in protecting public health.

F. <u>Security</u>. After considering the nature of the constitutional claim presented, and the absence of harm to Defendant from a temporary return to the status quo, the court determines that no security should be required for the issuance of the TRO. *Cf.* Fed. R. Civ. P. 65(c).

G. <u>Scope of the TRO</u>. Given the limited record before the court at this stage of the proceedings, and the gravity of the issues involved, the court is somewhat hesitant to simply say that Plaintiffs are free to conduct their religious services using the same social distancing and protective measures specified in the executive orders for similar exempt activities. In particular, Defendant has not had the opportunity to put on evidence that might support stricter safety measures for religious services. At the TRO hearing, Plaintiffs set forth specific plans for social distancing and safety precautions that appear to exceed the general requirements for similar exempt activities under EO 20-25. Until the court has an opportunity to hear evidence on these matters, the terms of the TRO will require Plaintiffs to comply with their proposed measures. Specifically, First Baptist Church of Dodge City will adhere to the following:

- Prior to and following the in-person service, the facility will be deep-cleaned;
- Invitations will be directed to regular church attendees for this in-person service;

- Individuals will be advised to continue to engage in "stay at home" protocols as directed by EO 20-16 in order to attend the service;
- No church members are known to have had any contact with known COVID-19 confirmed cases;
- Attendees will be advised to perform temperature checks at home on all attendees prior to attending the service. Individuals that are ill or have fevers will not attend;
- High-risk individuals will be advised not to attend the in-person service;
- Attendees will be advised to bring their own PPE, including masks and gloves;
- Attendees will be advised not to engage in hand shaking or other physical contact;
- Hand sanitizer will be available for use throughout the facility;
- The in-person service will be limited to 50 individuals in a space that has a capacity for 300 individuals (a cross-shaped auditorium 50 feet by 74 feet at the center; 2,950 square feet total, allowing almost 57 square feet available to each attendee at maximum social distancing);
- Co-habitating family units may sit closer together but otherwise the maximum social distancing possible will be used, however, at a minimum, the CDC recommended protocol will be observed with a minimum distance of at least 6 feet;
- A single point of entry and single point of exit on opposite sides of the building will be used, establishing a one-way traffic pattern to ensure social distancing;
- Ventilation will be increased as much as possible, opening windows and doors, as weather permits;
- These procedures will be communicated to church members in advance of the service;
- Church bulletin and offering plates will not be used during the service;
- Attendees will be advised to wash their clothes following the service;
- If Church leadership becomes aware of a clear, immediate, and imminent threat to the safety of the attendees or cannot follow the protocols listed above, the gathering will be immediately disbanded.

Calvary Baptist Church of Junction City will adhere to the following:

- Splitting out pews and marking designated sitting areas to keep non-cohabitating congregants at least six feet apart before, during, and after the worship service;
- Marking multiple entrances to encourage socially distanced foot traffic;
- Propping doors open to prevent the need for congregants to touch doors while entering and exiting the church or sanctuary;
- Suspending passing offering plates and bulletins;
- Actively discouraging handshaking or other social touching;
- Offering hand sanitizer throughout the building;
- Providing face masks to offer to any interested persons.

(*See* Doc. 1 at 8-11.)

**IV. Conclusion**

Defendant's motion to dismiss the complaint (Doc. 9) is DENIED. Plaintiffs' motion for a temporary restraining order (Doc. 7) is GRANTED. The court will file a separate order containing the terms of the TRO.

A hearing on Plaintiffs' request for a preliminary injunction is scheduled for April 23, 2020, at 9:00 a.m.

                                                                               s/ John W. Broomes
                                                                 JOHN W. BROOMES
                                                                 UNITED STATES DISTRICT JUDGE