# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| FIRST BAPTIST CHURCH, PASTOR STEPHEN ORMORD, CALVARY BAPTIST CHURCH, and PASTOR AARON HARRIS, | |
| *Plaintiffs,* | |
| v. | Case No. 20-1102-JWB |
| GOVERNOR LAURA KELLY, *in her official capacity,* | |
| *Defendant.* | |

---

### BRIEF OF KANSAS INTERFAITH ACTION
### AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANT

---

RICHARD B. KATSKEE*
ALEX J. LUCHENITSER*
   *Americans United for Separation of*
    *Church and State*
   *1310 L Street NW, Suite 200*
   *Washington, DC 20005*
   *(202) 466-3234*
   *(202) 466-3353 (fax)*
   *luchenitser@au.org*

WILLIAM J. SKEPNEK
   *Skepnek Law Firm P.A.*
   *1 Westwood Road*
   *Lawrence, KS 66044*
   *(785) 856-3100*
   *(785) 856-3099 (fax)*
   *bskepnek@skepneklaw.com*

**\* Pro hac vice motions submitted herewith
or forthcoming.**

*Counsel for* Amicus Curiae

# TABLE OF CONTENTS

Page(s)

Table of Authorities ................................................................ ii

Identity and Interests of *Amicus Curiae* ................................................1

Introduction and Summary of Argument ............................................2

Argument................................................................................4

I.   The Order Does Not Violate The Free Exercise Clause............................4

    A.   The order is neutral toward religion. .................................................5

    B.   The order is generally applicable........................................6

II.  The Order Satisfies The Compelling-Interest Test. ...................................8

    A.   The order serves a compelling governmental interest. .......................9

    B.   The order is narrowly tailored. ........................................ 10

III. The Establishment Clause Forbids The Requested Exemption............. 11

Conclusion ................................................................ 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Life League, Inc. v. Reno,*
47 F.3d 642 (4th Cir. 1995) ...................................................................... 9

*Binford v. Sununu,*
No. 217-2020-CV-00152 (N.H. Super. Ct. Mar. 25, 2020) ...................... 4

*Braunfeld v. Brown,*
366 U.S. 599 (1961) ........................................................................... 4, 13

*Church of the Lukumi Babalu Aye v. City of Hialeah,*
508 U.S. 520 (1993) ...................................................................*passim*

*Compagnie Francaise de Navigation*
*a Vapeur v. Louisiana Board of Health,*
186 U.S. 380 (1902) ........................................................................... 9

*Corp. of the Presiding Bishop of the Church of*
*Jesus Christ of Latter-day Saints v. Amos,*
483 U.S. 327 (1987) ............................................................................ 14

*Cutter v. Wilkinson,*
544 U.S. 709 (2005) ........................................................................... 13

*Employment Division v. Smith,*
494 U.S. 872 (1990) ...................................................................*passim*

*Epperson v. Arkansas,*
393 U.S. 97 (1968) ............................................................................. 11

*Estate of Randolph v. City of Wichita,*
No. 118,842, __ P.3d __, 2020 WL 288978
(Kan. Ct. App. Jan. 21, 2020) ................................................................ 7

*Estate of Thornton v. Caldor, Inc.,*
472 U.S. 703 (1985) ................................................................... 3, 12, 13

*Friends of DeVito v. Wolf,*
No. 68 MM 2020, 2020 WL 1847100 (Pa. Apr. 13, 2020) ...................... 4

*Frisby v. Schultz,*
487 U.S. 474 (1988) ...................................................................... 10, 11

*Globe Newspaper Co. v. Superior Court,*
457 U.S. 596 (1982) ........................................................................... 10

*Grutter v. Bollinger,*
    539 U.S. 306 (2003) ........................................................................... 9

*Hannibal & St. Joseph R.R. Co. v. Husen,*
    95 U.S. 465 (1877) ............................................................................. 9

*Hosanna-Tabor Lutheran Evangelical*
    *Church & School v. EEOC,*
    565 U.S. 171 (2012) ................................................................... 13, 14

*Hotze v. Hidalgo,*
    No. 2020-22609 (Tex. Dist. Ct. Apr. 13, 2020) ........................... 3

*Jacobson v. Massachusetts,*
    197 U.S. 11 (1905) .....................................................................*passim*

*Legacy Church, Inc. v. Kunkel,*
    No. 1:20-cv-327-JB-SCY,
    ECF No. 29 (D.N.M. Apr. 17, 2020) ........................................... 3

*Maryville Baptist Church, Inc. v. Beshear,*
    No. 3:20-cv-278-DJH,
    ECF No. 9 (W.D. Ky. Apr. 18, 2020) ......................................... 3

*McCormick v. Stalder,*
    105 F.3d 1059 (4th Cir. 1997) ................................................... 10

*McCreary County v. ACLU of Kentucky,*
    545 U.S. 844 (2005) ................................................................ 11, 12

*Nigen v. New York,*
    No. 1:20-cv-01576-EK-PK, ,
    ECF No. 7 (E.D.N.Y. Mar. 29, 2020) ...................................... 3, 4

*Pennhurst State School & Hospital v. Halderman,*
    465 U.S. 89 (1984) ........................................................................ 8

*Prince v. Massachusetts,*
    321 U.S. 158 (1944) ........................................................... 4, 10, 13

*Real Alternatives, Inc. v. Secretary Department*
    *of Health & Human Services,*
    867 F.3d 338 (3d Cir. 2017) ....................................................... 14

*Reynolds v. United States,*
    98 U.S. 145 (1879) ........................................................................ 5

*Roberts v. U.S. Jaycees,*
    468 U.S. 609 (1984) ................................................................... 11

*Sherbert v. Verner*,
374 U.S. 398 (1963) ........................................................................... 8, 9, 10, 11

*Texas Monthly, Inc. v. Bullock*,
489 U.S. 1 (1989) ...................................................................................... 12, 13

*Tolle v. Northam*,
No. 1:20-cv-00363-LMB-MSN,
ECF No. 9 (E.D. Va. Apr. 8, 2020),
*appeal docketed*, No. 20-1419 (4th Cir. Apr. 13, 2020)............................................ 3

*Ungar v. N.Y.C. Housing Authority*,
363 F. App'x 53 (2d Cir. 2010)................................................................... 8

*United States v. Lee*,
455 U.S. 252 (1982) ................................................................................ 12, 13

*Whitlow v. California*,
203 F. Supp. 3d 1079 (S.D. Cal. 2016) ........................................................ 10, 11

*Wisconsin v. Yoder*,
406 U.S. 205 (1972) ................................................................................. 9, 10

*Workman v. Mingo County Board of Education*,
419 F. App'x 348 (4th Cir. 2011) ................................................................... 10

## Constitutions, Statutes, and Orders

U.S. Const. amend I.............................................................................*passim*

42 U.S.C. § 2000bb(b) *et seq.* ...................................................................... 8

Executive Order 20-25 (2020) (Kelly) (E.O. 20-25)..............................................*passim*

Kan. Stat. Ann. § 21-5231 ........................................................................ 6

## Other Authorities

Associated Press, *20,000: US Death Toll Overtakes
Italy's as Midwest Braces*, N.Y. TIMES (Apr. 11, 2020),
https://nyti.ms/2ySaHzK ........................................................................ 2

*Attorney General William P. Barr Issues Statement on Religious
Practice and Social Distancing*, United States Department of
Justice (Apr. 14, 2020), https://bit.ly/2RIYzHO ....................................... 7

Matthew Barakat, *Judge rejects lawsuit over order;
no religious exemption*, WASH. POST (Apr. 9, 2020),
https://wapo.st/2xiqeIE.............................................................................. 4

Anna Christianson & Tiffany Littler, *Gov. Kelly issues executive order to limit church gatherings, funerals*, KSNT (updated Apr. 7, 2020 4:13 PM), https://bit.ly/3bZV0F5 .............................................................. 6

City News Service, *Judge Denies Church's Attempt to Hold In-Person Easter Sunday Services*, Fox5SanDiego.com (Apr. 10, 2020), https://bit.ly/3ccPvTG ............................................................................... 4

Hilda Flores, *One-third of COVID-19 cases in Sac County tied to church gatherings, officials say*, KCRA (Apr. 1, 2020, 2:55 PM), https://bit.ly/2XlCpPu .................................................... 15

Bailey Loosemore & Mandy McLaren, *Kentucky county 'hit really, really hard' by church revival that spread deadly COVID-19*, Louisville Courier Journal (updated Apr. 2, 2020 9:24 AM), https://bit.ly/2XkKCnd .................................... 15

Katie Mettler, *How the coronavirus compares with the flu*, Wash. Post (Mar. 10, 2020, 3:30 PM), https://wapo.st/3b3xC9L ........................... 1

Richard Read, *A choir decided to go ahead with rehearsal; Now dozens of members have COVID-19 and two are dead*, L.A. Times (Mar. 29, 2020), https://lat.ms/2yiLbU6 ............................................ 15

## IDENTITY AND INTERESTS OF *AMICUS CURIAE*

Kansas Interfaith Action is a statewide, multi-faith issue-advocacy organization that "puts faith into action" by educating, engaging and advocating on behalf of people of faith and the public regarding critical social, economic, and climate justice issues. KIFA (pronounced "KEE–fa") supporters are shaped by the values of our diverse faiths, which connect us to an age-old concern for justice, peace, and human dignity. Rooted in faith, we join hands across difference to work for moral public policy in Kansas. KIFA is a state public policy office of the Central States Synod of the Evangelical Lutheran Church in America and is a partner of the Kansas-Oklahoma Conference of the United Church of Christ.

KIFA supports Governor Kelly's inclusion of houses of worship in the ten-person limit for public gatherings in her executive order. Most congregations associated with KIFA have been meeting on-line since mid-March. KIFA believes that this is the most sensible course of action to take in the face of the unprecedented COVID-19 pandemic.

As faith leaders, KIFA's members place a high value on their religious freedom. But the faith traditions represented among KIFA's constituency do not require public gatherings for worship as part of the practice of faith. Instead, public gatherings are only preferred. Though in some cases, such as Catholic mass and Jewish services, elements of worship require personal attendance, these requirements can be fulfilled within the ten-person limit of Governor Kelly's executive order. Therefore, we believe that, under the Governor's order, no one's right to worship is being limited; only their ability to gather physically is affected. The pandemic is an extenuating circumstance

that calls on people of faith to accept temporary limitations on public worship that would be unacceptable in normal circumstances. But these are not normal circumstances, and we are willing to accept a temporary inconvenience for a greater good—the life and health of our congregants and our communities.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Kansas, along with most of the rest of the world, is facing a pandemic. The United States now has the most reported COVID-19-related deaths worldwide, and confirmed cases in the Midwest are increasing. *See* Associated Press, *20,000: US Death Toll Overtakes Italy's as Midwest Braces*, N.Y. TIMES (Apr. 11, 2020), https://nyti.ms/2ySaHzK. Leaders at all levels of government have therefore been asked to act decisively to protect their constituents' lives. As part of a statewide emergency public-health response, Governor Kelly has temporarily barred in-person gatherings of more than ten people to reduce the risk of transmission.

Though this order does have the effect of limiting some of Plaintiffs' religious activities, it does not violate their religious-exercise rights. The Supreme Court explained in *Employment Division v. Smith*, 494 U.S. 872 (1990), and *Church of the Lukumi Babalu Aye v. City of Hialeah*, 505 U.S. 520 (1993), that neutral, generally applicable laws reflecting no discriminatory intent toward religion do not violate the Free Exercise Clause of the First Amendment. Governor Kelly's order complies with this principle: The virus is just as likely to spread at religious events as at nonreligious ones, so the order applies to all gatherings equally, regardless of motivation. And the order allows faith leaders and houses of worship to continue operating under constraints similar to those imposed on other permitted activities.

But even if the Court were to conclude that heightened scrutiny should apply, the mass-gathering ban would still survive because it is narrowly tailored to advance the compelling governmental interest in protecting Kansas residents from a deadly disease.

What is more, the Establishment Clause of the First Amendment forbids granting an exemption from the order for religious services. For if government imposes harms on third parties when it exempts religious exercise from the requirements of the law, it impermissibly favors the benefited religion and its adherents over the rights, interests, and beliefs of the nonbeneficiaries. *See, e.g.*, *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 709–10 (1985). Holding that religious gatherings must be exempted from the Governor's public-health order would do just that. A single contagious person at a church can infect scores of fellow congregants, who may then expose family, friends, and strangers, including countless people who did not attend the service.

For reasons similar to those set forth here, many courts have rejected challenges like this case to COVID-19-related orders in recent weeks. *See Maryville Baptist Church, Inc. v. Beshear*, No. 3:20-cv-278-DJH, ECF No. 9 (W.D. Ky. Apr. 18, 2020) (denying TRO); *Legacy Church, Inc. v. Kunkel*, No. 1:20-cv-327-JB-SCY, ECF No. 29 (D.N.M. Apr. 17, 2020) (denying TRO in 100-page opinion); *Hotze v. Hidalgo*, No. 2020-22609 (Tex. Dist. Ct. Apr. 13, 2020) (denying TRO); *Tolle v. Northam*, No. 1:20-cv-00363-LMB-MSN, ECF No. 9 (E.D. Va. Apr. 8, 2020) (reaffirming and expounding upon denial of preliminary injunction), *appeal docketed*, No. 20-1419 (4th Cir. Apr. 13, 2020); *Nigen v. New York*, No. 1:20-cv-01576-EK-PK, ECF No. 7

(E.D.N.Y. Mar. 29, 2020) (denying TRO); *Binford v. Sununu*, No. 217-2020-CV-00152 (N.H. Super. Ct. Mar. 25, 2020) (denying preliminary injunction); City News Service, *Judge Denies Church's Attempt to Hold In-Person Easter Sunday Services*, Fox5SanDiego.com (Apr. 10, 2020), https://bit.ly/3ccPvTG (San Diego, California, federal judge denied TRO); Matthew Barakat, *Judge rejects lawsuit over order; no religious exemption*, WASH. POST (Apr. 9, 2020), https://wapo.st/2xiqeIE (Russell County, Virginia, state judge denied TRO); *see also Friends of DeVito v. Wolf*, No. 68 MM 2020, 2020 WL 1847100, at *1 (Pa. Apr. 13, 2020) (rejecting First Amendment and other constitutional challenges by non-life-sustaining businesses). This Court should do the same.

## ARGUMENT

### I.   THE ORDER DOES NOT VIOLATE THE FREE EXERCISE CLAUSE.

It is natural that, in difficult and scary times like these, people will desire the comfort and support that their faith community provides. The freedom to worship in accordance with one's spiritual practices and traditions is a right of the highest order, but the constitutional guarantee of religious freedom has never provided absolute license to engage in conduct consistent with one's religious beliefs. *E.g.*, *Braunfeld v. Brown*, 366 U.S. 599, 603 (1961) (plurality opinion). Yet Plaintiffs argue here that the Free Exercise Clause prohibits temporary limitations on religious gatherings even in the face of a severe global pandemic. That claim is not supported by the law: "The right to practice religion freely does not include liberty to expose the community . . . to communicable disease." *Prince v. Massachusetts*, 321 U.S. 158, 166–67 (1944).

Though government cannot forbid a religious practice *because it is religious*, religion-based disagreement with the law does not excuse noncompliance. "To permit this would be to make the professed doctrines of religious belief superior to the law of the land," which would "in effect . . . permit every citizen to become a law unto himself." *Smith*, 494 U.S. at 879 (quoting *Reynolds v. United States*, 98 U.S. 145, 166–67 (1879)). Rather, laws that burden religious conduct are constitutionally permissible—and need satisfy rational-basis review only—when they are neutral toward religion and apply generally. *Lukumi*, 508 U.S. at 531; *Smith*, 494 U.S. at 879. Governor Kelly's order here easily satisfies these requirements.

### A.  The order is neutral toward religion.

The neutrality requirement means that a law must not "infringe upon or restrict practices *because of* their religious motivation." *Lukumi*, 508 U.S. at 533 (emphasis added). That prohibition bars discrimination against religion both facially and through "religious gerrymanders" that target specific religious conduct. *Id.* at 534. The order here evinces no hostility toward religion. It bans all mass gatherings, religious or not: No gatherings that would put more than ten people in close contact are allowed for any purpose. Executive Order 20-25 (2020) (Kelly) (E.O. 20-25) ¶¶ 1.a–1.b. The meaning of that facially neutral blanket prohibition is unchanged by the order's inclusion of religious gatherings in a non-exhaustive list of examples of types of gatherings that are prohibited—religious gatherings would fall within the order's scope regardless.

Far from showing hostility toward religion, the evolution of the Governor's orders shows the Governor's respect for and solicitousness toward religion. Religious

gatherings were initially fully exempted from the orders. *See* Mem. & Order, ECF No. 14, at 14. The vast majority of faith communities were already meeting virtually when that version was in effect, however (as is the case now). It was only in response to factual developments showing the risk of unrestricted religious gatherings that the Governor added a restriction on religious services involving more than ten congregants or parishioners in the same enclosed space. *See id.* at 15 n.4; Anna Christianson & Tiffany Littler, *Gov. Kelly issues executive order to limit church gatherings, funerals*, KSNT (updated Apr. 7, 2020 4:13 PM), https://bit.ly/3bZV0F5 (one quarter of Kansas cases linked to religious gatherings). But even that restriction allows more than ten people—including "preachers, lay readers, choir or musical performers, or liturgists"—to conduct or perform a religious service so long as they observe social-distancing guidelines. E.O. 20-25 ¶ 1.c. This history shows a careful reluctance to interfere with religious activities, not anti-religious animus.

B. **The order is generally applicable.**

General applicability is closely related to neutrality. *Lukumi*, 508 U.S. at 531. It means that government, "in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief." *Id.* at 543. In other words, government cannot restrict religious conduct while allowing substantial comparable "nonreligious conduct that endangers [the asserted governmental] interests in a similar or greater degree." *Id.* The Governor's order generally prohibits gatherings of ten or more people and therefore plainly does not pursue the State's interests "only against conduct with a religious motivation." *See Lukumi*, 508 U.S. at 546.

That the order acknowledges some categorical exemptions does not negate its general applicability. Because "[a]ll laws are selective to some extent," they need not be universal to be generally applicable. *See Lukumi*, 508 U.S. at 542–43. Kansas law, for example, exempts cases of self-defense from liability for assault and battery (Kan. Stat. Ann. § 21-5231; *Estate of Randolph v. City of Wichita*, No. 118,842, __ P.3d __, 2020 WL 288978, at *7 (Kan. Ct. App. Jan. 21, 2020)), but no one understands that carveout to create a constitutional right to an exemption for religiously motivated uses of force. Rather, the fundamental question is whether the scope of a law's coverage demonstrates animus toward religious conduct by subjecting it to burdens not placed on a significant swath of analogous nonreligious conduct. *See id.* at 542–46 (explaining that city ordinances ostensibly aimed at protecting public health and preventing animal cruelty worked exclusively to bar Santeria religious animal sacrifice while leaving other animal slaughter unaffected).

Comparing similarly situated activities is key to sniffing out religious discrimination. *Cf. Attorney General William P. Barr Issues Statement on Religious Practice and Social Distancing*, United States Department of Justice (Apr. 14, 2020), https://bit.ly/2RIYzHO (urging that religious gatherings be treated like similar nonreligious gatherings, such as those at movie theaters, restaurants, and concert halls). A typical in-person religious service could have dozens of people sitting together in a room for an extended time, probably speaking to one another or singing at various points. Executive Order 25 bars analogous gatherings: It also applies to parades, social clubs, art shows, movie screenings, political conferences, educational lectures, restaurant dining rooms, libraries, and other events and venues.

Governor Kelly's order thus does not single out religious gatherings while permitting similar nonreligious gatherings. Moreover, the order draws no distinctions based on religious views or motivations with respect to exempt activities and locations—hospitals and food pantries, for example, are not subject to the gathering ban whether or not they have a religious affiliation. E.O. 20-25 ¶¶ 2.k, 2.o; *cf. Ungar v. N.Y.C. Hous. Auth.*, 363 F. App'x 53, 56 (2d Cir. 2010) (holding that limited categorical exceptions to public-housing policy did not negate general applicability because exceptions were equally available to religious and nonreligious applicants).

## II.   THE ORDER SATISFIES THE COMPELLING-INTEREST TEST.

Even if the Court were to conclude that the Governor's order must satisfy heightened scrutiny, it would still be lawful, because it is narrowly tailored to achieve a compelling governmental interest. *See Lukumi*, 508 U.S. at 531 (defining the compelling-interest test).[1] More than a century of constitutional jurisprudence demonstrates that restrictions on religious exercise tailored to containing contagious diseases withstand the strictest judicial scrutiny. Before its decision in *Smith* in 1990, the Supreme Court interpreted the Free Exercise Clause to require application of the compelling-interest test whenever religious exercise was substantially burdened by governmental action. *See, e.g.*, *Sherbert v. Verner*, 374 U.S. 398, 407 (1963); *see also* 42 U.S.C. § 2000bb(b) (purpose of federal Religious Freedom Restoration Act was "to

---

[1] Plaintiffs argue that their claims under the Kansas Constitution and the Kansas Preservation of Religious Freedom Act trigger heightened scrutiny. But the Eleventh Amendment bars federal courts from enjoining state officials to comply with state law. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). So those claims cannot support injunctive relief from this Court.

restore the compelling interest test as set forth in" *Sherbert* and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)). The Court's pre-*Smith* free-exercise decisions make clear that the test, while exacting, is not "fatal in fact" (*Grutter v. Bollinger*, 539 U.S. 306, 326–27 (2003)). And they routinely acknowledged that there is no right to religious exemptions from laws tailored to shield the public from serious disease.

### A.   The order serves a compelling governmental interest.

The State has a compelling interest in protecting the health and safety of the public in general and in preventing the spread of disease in particular. *See Sherbert*, 374 U.S. at 402–03; *accord Yoder*, 406 U.S. at 230 & n.20; *Am. Life League, Inc. v. Reno*, 47 F.3d 642, 655–56 (4th Cir. 1995). Indeed, an extensive body of case law reflects the overriding importance of the government's interest in combating communicable diseases.

"[P]owers on the subject of health and quarantine [have been] exercised by the states from the beginning." *Compagnie Francaise de Navigation a Vapeur v. La. Bd. of Health*, 186 U.S. 380, 396–97 (1902). On that basis, more than a century ago, the Supreme Court upheld a mandatory-vaccination law aimed at stopping the spread of smallpox. *See Jacobson v. Massachusetts*, 197 U.S. 11, 25 (1905). The Court straightforwardly rejected the idea that the Constitution barred such compulsory measures to protect health, citing the "fundamental principle" that personal liberty is subject to restraint "in order to secure the . . . health . . . of the state." *Id.* at 26 (quoting *Hannibal & St. Joseph R.R. Co. v. Husen*, 95 U.S. 465, 471 (1877)). Because "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members," individual rights are subject to reasonable

restrictions—especially during a public-health emergency such as the one that we now face. *See Jacobson*, 197 U.S. at 27.

The Supreme Court has thus repeatedly reaffirmed that public-health regulations like mandatory immunizations that burden religious exercise withstand heightened judicial scrutiny. *See Sherbert*, 374 U.S. at 402–03 (citing mandatory vaccinations in *Jacobson* as example of burden on religion that is permissible under strict scrutiny); *Yoder*, 406 U.S. at 230; *see also Prince*, 321 U.S. at 166–67. Lower federal courts have also consistently recognized that the governmental interest in preventing the spread of communicable disease is compelling. *See, e.g.*, *Workman v. Mingo Cty. Bd. of Educ.*, 419 F. App'x 348, 353–54 (4th Cir. 2011) ("[T]he state's wish to prevent the spread of communicable diseases clearly constitutes a compelling interest."); *McCormick v. Stalder*, 105 F.3d 1059, 1061 (4th Cir. 1997) ("[T]he prison's interest in preventing the spread of tuberculosis, a highly contagious and deadly disease, is compelling."); *Whitlow v. California*, 203 F. Supp. 3d 1079, 1089–90 (S.D. Cal. 2016) (collecting cases showing compelling governmental interest in fighting the spread of contagious disease). The State's interest here in stanching the spread of COVID-19 is no less compelling. And it calls for placing limitations consistent with the State's public-health interests on all mass gatherings, including religious ones.

## B.   The order is narrowly tailored.

The compelling-interest test requires that the challenged law be narrowly tailored to the interest at stake. *E.g.*, *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 607 (1982). Even "[a] complete ban can be narrowly tailored . . . if each activity within the proscription's scope is . . . appropriately targeted." *Frisby v.*

*Schultz*, 487 U.S. 474, 487 (1988); *see Roberts v. U.S. Jaycees*, 468 U.S. 609, 628–29 (1984) (ban on all gender discrimination is narrowly tailored to combatting evil of gender discrimination). Accordingly, the Supreme Court (*see Sherbert*, 374 U.S. at 403 (citing *Jacobson*, 197 U.S. at 26–27)) and many other courts (*see, e.g.*, *Whitlow*, 203 F. Supp. 3d at 1089–90 (collecting cases)) have concluded that blanket prohibitions on refusing immunizations satisfy strict judicial review.

Governor Kelly's order operates in the same way. No vaccine for COVID-19 yet exists, so the only way to slow its spread is to limit the number of opportunities for person-to-person transmission. Temporarily restricting the size of in-person gatherings and enforcing social-distancing guidelines in permitted activities is how the State achieves that objective. And because the State cannot know who is infected at any given time, the order is no broader than necessary to ensure that the targeted activities—physical gatherings that create opportunities for transmission of the virus—are curtailed. As modern technology allows religious services and activities to be conducted remotely, the order permits central and essential religious practices to go on. Indeed, the order's restrictions on religious services are carefully tailored to allow houses of worship and faith leaders to continue operations while many businesses and other institutions are forced to close completely.

## III.   THE ESTABLISHMENT CLAUSE FORBIDS THE REQUESTED EXEMPTION.

The rights to believe, or not, and to practice one's faith, or not, are sacrosanct. But they do not extend to imposing the costs and burdens of one's beliefs on others. The federal Religion Clauses "mandate[ ] governmental neutrality between religion and religion, and between religion and nonreligion." *McCreary County v. ACLU of*

*Ky.*, 545 U.S. 844, 860 (2005) (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)). That neutrality requirement forbids the government not just to target religion for worse treatment (*see* Part I, *supra*) but also to grant religious exemptions that would detrimentally affect nonbeneficiaries (*see Estate of Thornton*, 472 U.S. at 709–10). For when government purports to accommodate the religious exercise of some by shifting costs or burdens to others, it prefers the religion of the benefited over the rights, beliefs, and interests of the nonbeneficiaries, in violation of the Establishment Clause. Exempting Plaintiffs from the order would contravene this settled constitutional rule.

*a.* In *Estate of Thornton*, for example, the U.S. Supreme Court invalidated a law requiring employers to accommodate Sabbatarians in all instances, because "the statute t[ook] no account of the convenience or interests of the employer or those of other employees who do not observe a Sabbath." 472 U.S. at 709–10. The Court held that "unyielding weighting in favor of Sabbath observers over all other interests" has "a primary effect that impermissibly advances a particular religious practice," violating the Establishment Clause. *Id.* at 710. Similarly, in *Texas Monthly, Inc. v. Bullock*, the Court invalidated a sales-tax exemption for religious periodicals because, among other defects, it unconstitutionally "burden[ed] nonbeneficiaries" by making them pay "to offset the benefit bestowed on subscribers to religious publications." 489 U.S. 1, 18 n.8 (1989) (plurality opinion).

The Supreme Court's pre-*Smith* Free Exercise Clause jurisprudence is consistent, demonstrating that religious exemptions that harm others cannot be required even under the compelling-interest test. In *United States v. Lee*, the Court

rejected an Amish employer's request for an exemption from paying social-security taxes because the exemption would have "operate[d] to impose the employer's religious faith on the employees." 455 U.S. 252, 261 (1982). In *Braunfeld*, the Court declined to grant an exemption from Sunday-closing laws because it would have provided Jewish businesses with "an economic advantage over their competitors who must remain closed on that day." 366 U.S. at 608–09. And in *Prince*, the Court denied a request for an exemption from child-labor laws to allow minors to distribute religious literature because while "[p]arents may be free to become martyrs themselves . . . it does not follow [that] they are free . . . to make martyrs of their children." 321 U.S. at 170. That is because "[r]eal liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to use his own [liberty] . . . regardless of the injury that may be done to others." *Jacobson*, 197 U.S. at 26.

In short, a religious accommodation "must be measured so that it does not override other significant interests" (*Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005)) and must not "impose substantial burdens on nonbeneficiaries" (*Texas Monthly*, 489 U.S. at 18 n.8 (plurality opinion)). When nonbeneficiaries would be unduly harmed, religious exemptions are forbidden. *Cutter*, 544 U.S. at 720; *Estate of Thornton*, 472 U.S. at 709–10.

*b.* In only one narrow set of circumstances (in two cases) has the U.S. Supreme Court ever upheld religious exemptions that materially burdened third parties— namely, when core Establishment and Free Exercise Clause protections for the ecclesiastical authority of religious institutions required the exemption. In *Hosanna-*

*Tabor Lutheran Evangelical Church & School v. EEOC*, 565 U.S. 171, 194–95 (2012), the Court held that the Americans with Disabilities Act could not be enforced in a way that would interfere with a church's selection of its ministers. And in *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 339–40 (1987), the Court upheld, under Title VII's statutory religious exemption, a church's firing of an employee who was not in religious good standing. These exemptions did not amount to impermissible religious favoritism, and therefore were permissible under the Establishment Clause, because they directly implicated "church autonomy." *Real Alts., Inc. v. Sec'y Dep't of Health & Human Servs.*, 867 F.3d 338, 352 (3d Cir. 2017).

This case does not implicate the special protections for ecclesiastical authority because it does not present questions regarding internal matters such as hiring clergy or determining religious membership. Rather, it presents the opposite question: whether there is a constitutional right to put countless people *outside* the church at greater risk of exposure to deadly disease.

*c.* Granting an exemption to Plaintiffs here would elevate their religious preferences over the health of the entire community. By holding religious gatherings, Plaintiffs not only would put themselves in danger but also would increase the risk of contagion for everyone with whom they or their parishioners come into contact, including children, the elderly, and others at the highest risk of severe illness.

The State is facing an unprecedented public-health emergency, and in response to this grave threat, the Governor has ordered the people of Kansas to forgo large gatherings and to observe social-distancing guidelines during certain permitted

14

activities. Governor Kelly has determined that these steps will slow the spread of the virus and ultimately save lives.

If the State is instead forced to exempt Plaintiffs—and all others who follow with legal challenges—everyone will be in greater danger of contracting the virus. Religious gatherings are just as likely as any other gathering to spread COVID-19, and the examples are sadly piling up across the country. Officials in Sacramento County, California, for example, have traced roughly a third of the county's more than 300 confirmed cases back to church gatherings. Hilda Flores, *One-third of COVID-19 cases in Sac County tied to church gatherings, officials say*, KCRA (Apr. 1, 2020, 2:55 PM), https://bit.ly/2XlCpPu. After a church-choir practice—at which members attempted to observe distancing and hygiene guidance—45 out of 60 attendees fell ill, and two tragically died. Richard Read, *A choir decided to go ahead with rehearsal; Now dozens of members have COVID-19 and two are dead*, L.A. TIMES (Mar. 29, 2020), https://lat.ms/2yiLbU6. And a church event in Louisville last month has been "linked to at least 28 cases . . . and two deaths." Bailey Loosemore & Mandy McLaren, *Kentucky county 'hit really, really hard' by church revival that spread deadly COVID-19*, LOUISVILLE COURIER JOURNAL (updated Apr. 2, 2020), https://bit.ly/2XkKCnd.

A single unwitting carrier in Plaintiffs' congregations could cause a ripple effect throughout the entire community: That one carrier might pass the virus to his neighbors in the pews, who might then return home and pass it to their family members, including people at high risk of severe illness. If those infected family members then go to the doctor's office, or to the grocery store for milk, they may potentially expose others, who may then do the same to their families—and so on.

And the more people who get sick, the more strain is placed on the hospital system, and the greater the chance that people die due to lack of healthcare resources. The Establishment Clause forbids the government to grant religious exemptions for conduct that threatens to harm so many.

## CONCLUSION

KIFA's members believe that, in the extraordinary circumstances we face today, Governor Kelly's order is consistent with the teachings of the faith traditions that form the basis of our organization.

The Jewish principle *pikuah nefesh* teaches that saving a life is of the utmost importance and that almost every mandated religious observance, no matter how central, is secondary to it. With the cooperation of all of us, this pandemic will abate, and people of faith will be able to celebrate many more Easters and Passovers together in their extended communities. But "[t]he dead cannot praise the Lord." *Psalms* 115:16.

Christians profess that Jesus said, "Where two or three are gathered in my name, I'm there with them." *Matthew* 18:20. In a discussion about the worship-style differences between Judeans and Samaritans, Jesus responded: "The time is coming—and is here!—when true worshippers will worship in spirit and truth. The Father looks for those who worship him this way. God is spirit, and it is necessary to worship God in spirit and truth." *Luke* 4:23–24. At the evangelical heart of the Christian faith is the central belief that faithful worship and encounter with God in Christ can never be limited to a specific building, place, or time. Christians are always free, at any time and place, alone or with others, to call upon God in an attitude of

16

worship. This spiritual practice is in no way limited by the Governor's order. And, alongside worship, healing and care for the sick have been defining elements of Christian faith practices since Jesus's own ministry. Cooperative support of safer-at-home orders in the midst of this pandemic is the most faithful witness a Christian can offer in these times.

Respecting these beliefs, Governor Kelly's executive order aims at a delicate balance: taking steps to protect public health while not unduly burdening the free exercise of religion. KIFA believes that the Governor has done so effectively, limiting (but not eliminating) in-person gatherings while other elements of religious and congregational life continue via technology. The order is a temporary measure based on extenuating circumstances, and when the disaster abates so will these restrictions. KIFA believes that the value of human life outweighs the inconvenience caused by the executive order, and we urge the Court to deny Plaintiffs' request for a preliminary injunction against the Governor's order.

Respectfully submitted,

/s/ William J. Skepnek

RICHARD B. KATSKEE*                    WILLIAM J. SKEPNEK
ALEX J. LUCHENITSER*                       *Skepnek Law Firm P.A.*
   *Americans United for*                   *1 Westwood Road*
     *Separation of Church and*          *Lawrence, KS 66044*
     *State*                                        *(785) 856-3100*
   *1310 L Street NW, Suite 200*            *(785) 856-3099 (fax)*
   *Washington, DC 20005*                   *bskepnek@skepneklaw.com*
   *(202) 466-3234*
   *(202) 466-3353 (fax)*
   *luchenitser@au.org*

   *\* Pro hac vice motions*
   *submitted herewith or*
   *forthcoming.*

*Counsel for* Amicus Curiae

Date:    April 21, 2020.