## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

FIRST BAPTIST CHURCH;                    )
PASTOR STEPHEN ORMORD;                   )
CALVARY BAPTIST CHURCH;                  )
PASTOR AARON HARRIS,                     )
               Plaintiffs,          )
                              )
v.                                       )          Case No. 6:20-cv-01102-JWB-GEB
                              )
                              )
GOVERNOR LAURA KELLY,                    )
in her official capacity; ADJUTANT GENERAL )
DAVID WEISHAAR, in his official capacity; )
GEARY COUNTY SHERIFF DANIEL E.           )
JACKSON, JR. in his official capacity; FORD )
COUNTY SHERIFF WILLIAM CARR, in his      )
official capacity,                       )
                              )
              Defendants.            )
_____)

## AMENDED VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

1.      On April 7, 2020, five days before Easter Sunday, Kansas Governor Laura Kelly issued Executive Order 20-18, which prohibited all "mass gatherings" of 10 or more people in a confined or enclosed space at the same time. *See* Executive Order 20-18, attached as **Exhibit 1** (hereinafter "EO 20-18"). EO 20-18 stated it remained in effect until May 1, 2020.

2.      While EO 20-18 carved out broad exemptions for 26 types of secular activities from this gathering ban, including, bars and restaurants, libraries, shopping malls, retail establishments, and office spaces the order singled out "churches and other religious services or activities" to expressly *prohibit* any type of gathering of more than ten non-performing individuals, regardless of whether social distancing, hygiene, and other efforts to slow the spread of COVID-19 were practiced.

3.      Notably, the allowance for persons to gather in particular contexts was carried over from EO 20-14 (Governor Kelly's previous mass gathering order) to EO 20-18 for libraries with no express requirement that such persons do so only if they can "engage in appropriate social distancing." Under EO 20-18, persons could gather in shopping malls and retail establishments "where large numbers of people are present but are generally not within arm's length of one another for more than 10 minutes."  Under EO 20-18 as under EO 20-14, persons could gather at restaurants and bars provided only that the facilities "preserve social distancing of 6 feet between tables, booths, bar stools, and ordering counters; and cease self-service of unpackaged food, such as in salad bars or buffets." However, religious gatherings were banned outright if the number of non-performing individuals present exceeded 10 persons.

4.      EO 20-18 rescinded Executive Order 20-14, the Governor's previous mass gathering ban. *See* Executive Order 20-14, attached as **Exhibit 2** (hereinafter "EO 20-14"). EO 20-14 had expressly exempted "religious gatherings" from the mass gathering ban, provided that "attendees can engage in appropriate social distancing." *See id.* at Section 2(c).

5.      Moreover, Executive Order 20-16, the Governor's state-wide "stay-at-home" order, expressly allowed Kansans to "perform or attend religious or faith-based services or activities" as exempt activities under the order. *See* Executive Order 20-16, attached hereto as **Exhibit 3**.

6.      On April 8, 2020, Kansas Attorney General Derek Schmidt issued a memorandum to all Kansas prosecutors and law enforcement stating that the religious gathering prohibitions of EO 20-18 "likely violate both state statute and the Kansas Constitution." *See* Memorandum from Attorney General Derek Schmidt (April 7, 2020), attached hereto as **Exhibit 4** at 5.

7.      Attorney General Schmidt concluded in his memo that:

provisions of the governor's order that purport to *criminalize* certain gatherings for religious services or activities likely violate both state statute and the Kansas Constitution, which would render them void and unenforceable. . . . Law enforcement are advised to encourage cooperative compliance with the new provisions of EO 20-18 and to avoid engaging in criminal enforcement of its limitations on religious facilities, services or activities.

*Id.*

8.      On April 8, 2020, the Kansas Legislative Coordinating Council (hereinafter "LCC") voted to rescind EO 20-18 under the ostensible authority of HCR 5025, citing the constitutionality concerns raised by Attorney General Schmidt's memorandum.

9.      On April 9, 2020, Governor Kelly sued the Kansas Legislature and the LCC in an original quo warranto action with the Kansas Supreme Court.

10.     As early as April 3, 2020, prior to the issuance of EO 20-18 legislative leadership had discussions with the Governor's Office regarding the constitutionality of imposing a limitation on church gatherings. Those discussions continued after the issuance of EO 20-18 and after the LCC attempted to revoke EO 20-18. Indeed, prior to the Governor filing the Quo Warranto action, legislative leadership requested that the Governor merely remove the criminal penalties associated with EO 20-18 and they would allow the EO to stand. That request was refused and the Quo Warranto action was ultimately filed by the Governor.

11.     On April 11, 2020, the Kansas Supreme Court granted emergency relief to Governor Kelly by narrowly ruling that the LCC lacked the authority to rescind EO 20-18 under the plain language of HCR 5025. The court expressly declined to consider the constitutionality of the religious gatherings ban under EO 20-18, stating in its opinion that the religious liberty considerations must be brought in a separate action. *See* Kelly v. LCC et al., Slip Op. No. 122,765 at 3, 23 (Kan. 2020).

12.     On Easter Sunday, April 12, 2020, in Dodge City, Kansas, Plaintiffs First Baptist Church and Pastor Stephen Ormord attempted to hold an outdoor, "drive-in" church service with approximately 20 of their congregants parked in cars in front of the church spaced 6 feet apart. Due to high winds and technological difficulties, the congregants were unable to hear or effectively participate in the service. The church had already adopted rigorous social distancing and health safety protocol to protect individuals gathered for worship, and the congregation was able to safely conduct the service within the sanctuary space pursuant to that protocol by remaining 6 feet apart throughout the service.

13.     On Easter Sunday, April 12, 2020, in Junction City, Kansas, Plaintiffs Calvary Baptist Church and Pastor Aaron Harris held an in-door church service with 21 of their congregants while adopting rigorous social distancing and health safety protocols to protect individuals gathered for worship. A member of local law enforcement monitored the service inside the building.

14.     On April 14, Pastor Harris spoke with the Geary County Sheriff, Defendant Daniel E. Jackson Jr., to discuss whether the Sheriff would enforce the prohibition on church gatherings in EO 20-18. Defendant Jackson warned Pastor Harris that he would be subject to criminal enforcement of Governor's Executive Order 20-18 should his church hold an in-person service the following week in which more than 10 people were sitting in the pews.

15.     On April 14, 2020, United States Attorney General William Barr issued a statement that "the First Amendment and federal statutory law" also prohibit governments from

> impos[ing] special restrictions on religious activity that do not also apply to similar nonreligious activity. For example, if a government allows movie theaters, restaurants, concert halls, and other comparable places to assemble to remain open and unrestricted, it may not order houses of worship to close, limit their congregation size, or otherwise impede religious gatherings. Religious institutions must not be singled out for special burdens.

*See* Statement of Attorney General William P. Barr, attached hereto as **Exhibit 5**.

16.     In his statement, Attorney General Barr also announced the Department of Justice had filed a Statement of Interest in support of a Mississippi church that allegedly sought to hold parking lot worship services before being criminally cited by local law enforcement. *See id;* The United States' Statement of Interest in Support of Plaintiffs, 4:20-cv-64-DMB-JMV) (N.D.Miss. 2020), attached hereto as **Exhibit 6**.

17.     On April 15, 2020, counsel for First Baptist Church sent a letter to Clay Britton, general counsel for Governor Kelly, requesting that Governor Kelly incorporate more narrowly tailored restrictions into her statewide order prohibiting churches from holding worship services with more than 10 non-performing members. In the letter, counsel requested the Governor make specific allowance for churches to hold in-person, indoor worship services provided the church congregants follow rigorous social distancing and healthy safety protocol as set forth in the letter; requirements which exceed those imposed by EO 20-18 on other similar secular facilities. *See* Letter to Clay Britton, Chief Counsel for Governor Laura Kelly, dated April 15, 2020, attached as **Exhibit 7**.

18.     On April 16, Mr. Britton responded but did not permit the church to meet nor rescind or modify the Order, but rather stated that the Governor's Office was reviewing the request and "will reach a decision as soon as tomorrow." *See* Letter to Ryan Kriegshauser, dated April 16, 2020, attached as **Exhibit 8**.

19.     Later that day, Counsel for the Plaintiffs replied that they were proceeding with a lawsuit, given the limited time frame before Sunday.

20.     On April 16, 2020, Plaintiffs filed their original Verified Complaint. Plaintiffs' counsel sent an electronic copy of the Verified Complaint to Mr. Britton.

21.     On April 17, 2020, Plaintiffs filed a Motion for Expedited Hearing and Motion for a Temporary Restraining Order (hereinafter, the "Motion for TRO").

22.     Later that same day, in response to the Complaint, the Governor's Office issued Executive Order 20-25 ("EO 20-25") which revoked and replaced EO 20-18. *See* EO 20-25 attached as **Exhibit 9**.

23.     Also on that same day, Defendant Kelly filed a Motion to Dismiss attaching EO 20-25 as an exhibit. (Doc. 9).

24.     EO 20-25 removed "libraries" and "shopping malls" from the list of exceptions to the "mass gatherings" limitation and made clarifying comments related to the restrictions on retail establishments and retail food establishments but maintained the prohibition on religious gatherings of more than 10 non-performing people.

25.     On April 17, the Court held an expedited hearing on both the Motion for TRO and the Motion to Dismiss.

26.     On April 18, the Court issued a Memorandum and Order (Doc. 14) denying the Motion to Dismiss and granting the Motion for TRO. The Court also issued a TRO (Doc. 15) enjoining Defendant Kelly from enforcing EO 20-18 and EO 20-25 against Plaintiffs provided that Plaintiffs comply with the social distancing guidelines set forth in the TRO.

27.     After the issuance of the TRO, the Governor released the following statement which was widely reported by Kansas media outlets:

> We are in the middle of an unprecedented pandemic. We all want to resume our normal lives as soon as possible, but for now the data and science tell us there's still a serious threat from COVID-19 – and when we gather in large groups, the virus spreads.
>
> My executive order is about saving Kansans' lives and slowing the spread of the virus to keep our neighbors, our families and our loved ones safe. During public health emergencies, we must take proactive measures to save lives.

Kansas has had six deaths and more than 80 cases of COVID-19 that have originated from religious gatherings. The court's temporary order noted that, given the gravity of the issues involved, the order only applies to the two plaintiffs to the lawsuit. All other religious gatherings must continue to adhere to the requirements of Executive Order 20-25 and limit gatherings to 10 or fewer attendees.

Kansas is not alone in restricting gatherings, including religious gatherings. A majority of states and hundreds of local governments across the country have imposed similar temporary restrictions to combat the COVID-19 pandemic.

There have been at least eight other legal challenges like this one, and so far none of them have ruled against a mass gathering restriction like ours. Courts across the country have recognized that during this pandemic emergency the law allows governments to prioritize proper public health and safety,

This is not about religion. This is about a public health crisis. This ruling was just a preliminary step. There is still a long way to go in this case, and we will continue to be proactive and err on the side of caution where Kansans' health and safety is at stake.

28.     On Saturday, April 18, 2020, Plaintiff First Baptist Church ("FBC") finalized preparations to conduct an in-person service on April 19, 2020.

29.     On April 19, 2020, FBC conducted an in-person service and offered streaming service to congregants that did not attend in person.

30.     FBC complied with the following social distancing and public health protocols contained in the TRO and posted notices of those protocols on all facility doors:

- Prior to and following the in-person service, the facility was deep-cleaned;

- Notices were directed to regular church attendees for this in-person service;

- Individuals were advised to continue to engage in "stay at home" protocols as directed by EO 20-16 in order to attend the service;

- No church members were known to have had any contact with known COVID-19 confirmed cases;

- Attendees were advised to perform temperature checks at home on all attendees prior to attending the service. Individuals that were ill or had fevers were advised not to attend;

- High-risk individuals were advised not to attend the in-person service;

- Attendees were advised to bring their own PPE, including masks and gloves;

- Attendees were advised not to engage in hand shaking or other physical contact;

- Hand sanitizer was available for use throughout the facility;

- The in-person service was limited to 40 individuals in a space that has capacity for 300 individuals and pews were marked off with colored tape to achieve maximum social distancing.

- Cohabitating family units were allowed sit closer together but otherwise the maximum social distancing possible was be used, however, at a minimum, the CDC recommended protocol was observed with a minimum distance of at least 6 feet;

- A single point of entry and single point of exit on opposite sides of the building was used, establishing a one-way traffic pattern to ensure social distancing;

- Ventilation was increased as much as possible, opening windows and doors, as weather permitted;

- These procedures were communicated to church members in advance of the service;

- Church bulletin and offering plates were not used during the service;

- Attendees were advised to wash their clothes following the service;

- Church leadership was not aware of a clear, immediate, and immanent threat to the safety of the attendees and did not determine it was unable to follow the protocols listed above.

31.     Approximately 26 individuals attended FBC's service on April 19, 2020. FBC was able to hold their worship service consistent with the guidelines and without any unexpected complications.

32.     In-person congregants at FBC reported a meaningful experience and enthusiastically enjoyed personally participating in the service after weeks of social distancing.

33.     Unfortunately, as with previous services, the internet live stream encountered problems including a bad echo at the beginning of the service, interruptions, and off-site listeners having difficulty viewing the internet-streamed service due to bandwidth limitations.

34.     Similarly, after the TRO was issued, Plaintiff Calvary Baptist Church ("CBC") finalized preparations to conduct an in-person service on April 19, 2020.

35.     On April 19, 2020, CBC conducted an in-person service and offered its streaming service again to congregants who chose not to attend in person. [1]

36.     CBC complied with the following social distancing and public health protocols contained in the TRO and posted notices listing the protocols on all facility doors:

- Splitting out pews and marking designated sitting areas to keep non-cohabitating congregants at least six feet apart before, during, and after the worship service;

- Marking multiple entrances to encourage socially distanced foot traffic;

---

[1] *See* "Junction City Church Holds First Service After Federal Judge Allows Gatherings," KWCH, April 19, 2020 *available at* https://www.kwch.com/content/news/Junction-City-church-holds-first-service-after-Fed-judge-allows-gatherings-569774191.html.

- Propping doors open to prevent the need for congregants to touch doors while entering and exiting the church or sanctuary;

- Suspending passing offering plates and bulletins;

- Actively discouraging handshaking or other social touching;

- Offering hand sanitizer throughout the building;

- Providing face masks to any interested persons.

37.     CBC was able to hold their worship service consistent with the guidelines and without any unexpected complications. Approximately 30 individuals attended the morning service on April 19, 2020.

38.     In-person congregants enthusiastically enjoyed personally participating in the service after weeks of social distancing.

39.     As of April 15, 2020, the Kansas Department of Health and Environment (hereinafter "KDHE") reports that Ford County, Kansas (Dodge City) has 32 confirmed cases of COVID-19. *See* KDHE COVID-19 Quick Stats, updated 4/15/2020, attached as **Exhibit 10.**

40.     Ford County has a population of approximately 33,619 people.  As of April 15, 2020, the per capita rate of COVID-19 infection in the county was approximately 0.095%, or approximately one tenth of 1%.

41.     Since April 15, 2020, Ford County has seen a large increase in confirmed cases of COVID-19 in at least two meat processing plants in the county. Widespread media reports, as well as comments by members of Governor Kelly's administration, state that the increase in cases in Ford County is almost solely located in the meat packing plants. The meatpacking processing plants remain open at this time, and Governor Kelly's administration has worked

directly with the meat packing plants to help them adopt social distancing measures to keep the

meat packing plants in operation.

42.    On April 20, 2020, at a press conference, Secretary of Agriculture Mike Beam

responded to a question regarding the point at which the meat processing plants would be closed

by stating: "We're not there. Obviously, it's happened in other states and *that's why Governor*

*Kelly has put an emphasis on let's do all we can to make sure we keep those viable* and protect

our workers." (emphasis added).

43.    Later in the press conference, Secretary Beam stated:

> The question is about is there anything specific to the meat processing industry that
> causes a bigger risk, and I would say, these are plants with larger numbers of
> employees, and in many situations they would be working fairly close to each other.
> A lot of the facilities like this with this many employees are no longer operating,
> but this is a critical infrastructure need, but at the same time as these plants are
> responsive, they're spreading people out where they can, and they're installing
> individual shields between workers, making sure they all have facial protection. *So*
> *those are steps to minimize that. But the one thing we learned when we visited with*
> *the plants is they will do what they can and want to know how they can do more.*
> But what drives this as much as anything is what people do when they're not at
> work, and *it just reinforces the need for social distancing in our daily lives.*

(Emphasis added).

44.    At that same press conference, Secretary of Health and Environment Lee Norman

responded to a question regarding whether specific numbers of cases would be released by the

plants by stating:

> We typically at the state level don't release that information, and we allow the local
> health department since they have primary jurisdiction to do the investigation or
> release that kind of information. It's a delicate balancing act, and it's really not as
> much about privacy as about the sharing of information so that people understand
> where their real risks really are. A great example is, we'll say, in Dodge or Garden
> City, that we also are tracking a lot of the family members, and we want to make
> sure we don't evaluate the people working in the plants as if they were a separate
> entity detached from their families and from their communities *and so we want to*
> *make sure that we one, don't instill fear and have people stay home needlessly,* and

secondly, we really give the families everything they need as well, so it's a delicate balancing act, and typically we leave it to the local health officials.

(Emphasis added).

45.     As of April 15, 2020, KDHE reports that Geary County, Kansas (Junction City) has 10 confirmed cases of COVID-19. *See id.*

46.     Geary County has a population of approximately 34,895 people. As of April 15, 2020, the per capita rate of COVID-19 infection in the county approximately 0.028%, or one thirty fifth of 1%.

## JURISDICTION AND VENUE

47.     This civil rights action raises federal questions under the United States Constitution, specifically the First and Fourteenth Amendments, and under federal law, particularly 42 U.S.C. § 1983.

48.     This Court has subject matter jurisdiction over the federal claims under 28 U.S.C. § 1331 and 1343.

49.     This Court has supplemental jurisdiction over the state claims under 28 U.S.C. § 1367.

50.     This Court has authority to grant the requested declaratory relief under 28 U.S.C. §§ 2201 and 2002, the requested injunctive relief under 28 U.S.C. § 1343, and reasonable attorney fees and costs under 42 U.S.C. § 1988.

51.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this district and Defendants reside in this district.

## PLAINTIFFS

52.     Plaintiff First Baptist Church is a non-profit church organized exclusively for religious purposes within the meaning of § 501(c)(3) of the Internal Revenue Code. First Baptist Church is located in Dodge City, Kansas.

53.     Plaintiff Stephen Ormord serves as Pastor of First Baptist Church in Dodge City, Kansas.

54.     Plaintiff First Baptist Church is located in Dodge City, Ford County, Kansas.

55.     Plaintiff Calvary Baptist Church is a non-profit church organized exclusively for religious purposes within the meaning of § 501(c)(3) of the Internal Revenue Code. Calvary Baptist Church is located in Junction City, Kansas.

56.     Plaintiff Calvary Baptist Church is located in Junction City, Geary County, Kansas.

57.     Plaintiff Aaron Harris serves as Pastor of Calvary Baptist Church in Junction City, Kansas.

**DEFENDANTS**

58.     Defendant Laura Kelly is the Governor of Kansas and is sued in her official capacity only.

59.     On March 12, 2020, Governor Kelly declared a state of disaster emergency and has not yet altered that declaration or lifted the state of disaster emergency.

60.     Under Kansas' Emergency Management Act, K.S.A. 48-924 et seq., the governor has very broad legislative and executive authority during a state of disaster emergency to create laws and policies and to directly enforce those laws and policies under threat of criminal penalty using the state's police power.

61.     Defendant Kelly has the legislative power to "issue orders and proclamations which shall have the force and effect of law during the period of a state of disaster emergency declared under subsection (b) of K.S.A. 48-924, and amendments thereto." K.S.A. 48-925(b).

62.     By issuing the prohibitions and regulations in the executive orders at issue in this suit, Defendant Kelly exercised her legislative powers.

63.     By ordering and directing enforcement of those same executive orders, Defendant Kelly has used her executive power to enforce, or promised to enforce, those same prohibitions and regulations.

64.     K.S.A. 48-925(a) grants the governor very broad executive power: "[d]uring any state of disaster emergency declared under K.S.A. 48-924, and amendments thereto, the governor shall be commander-in-chief of the organized and unorganized militia and of all other forces available for emergency duty."

65.     That section also states that "[t]o the greatest extent practicable, the governor shall delegate or assign command authority by prior arrangement, embodied in appropriate executive orders or in rules and regulations of the adjutant general, *but nothing herein shall restrict the authority of the governor to do so by orders issued at the time of a disaster.*" (Emphasis added).

66.     Further, K.S.A. 48-925(c)(10) gives the Governor the power to *"require and direct* the cooperation and assistance of state and local governmental agencies and officials," including the enforcement of her Executive Orders. (Emphasis added).

67.     Under Kan. Const. art. I, § 3, "the supreme executive power of this state shall be vested in a governor, who shall be responsible for the enforcement of the laws of this state."

68. No other constitutional executive officer is vested *constitutionally* with law enforcement power.

69. Under Kan. Const. art. VIII, § 4, the governor, as head of the militia, has the power to enforce EO 20-25 by "call[ing] out the militia to execute the laws."

70. Under K.S.A. 48-934, the governor and her subordinates also have the authority "during a state of disaster emergency proclaimed under K.S.A. 48-924," to exercise the "powers and duties and immunities of peace officers of the state of Kansas." That is, Defendant Kelly and her subordinates have police power to enforce state laws, including EO 20-25, during a state of disaster emergency.

71. Governor Kelly and her subordinates, including the other Defendants, thus possess the power to enforce the church gathering prohibition.

72. Under K.S.A. 48-939: "The knowing and willful violation of any provision of this act or any rule and regulation adopted by the adjutant general under this act or any lawful order or proclamation issued under authority of this act … shall constitute a class A misdemeanor and any person convicted of such violation shall be punished as provided by law therefor."

73. Thus, Defendant Kelly and her subordinates have the power to impose criminal penalties on anyone, including Plaintiffs, who violates the church gathering ban. EO 20-18 was issued pursuant to Defendant Kelly's powers under the Emergency Management Act.

74. Thus, EO 20-18 includes a direct command to law enforcement, over which she exercises temporary direct control pursuant to K.S.A. 48-925, to enforce the provisions of EO 20-18. EO 20-18 does not legally restrict in any way the ability for Governor Kelly, or any of her subordinates, to enforce the provisions of EO 20-18.

75.    Defendant Kelly has decided to enforce the church gatherings prohibition pursuant to the above powers in her recent order, EO 20-25, which superseded EO 20-18 on April 17, 2020.

76.    In EO 20-25, Defendant Kelly "direct[s] and order[s]" EO 20-25 "pursuant to the authority vested in me as Governor of the State of Kansas, including the authority granted me by K.S.A. 48-924 and K.S.A. 48-925."

77.    Defendant Major General David Weishaar, Adjutant General of Kansas, is sued in his official capacity only.

78.    As Adjutant General of Kansas, Defendant Weishaar is the head of the state militia, leads the state's Army and Air Guard operations, directs the state's division of homeland security, and, as relevant here, directs the state's division of emergency management.

79.    Under K.S.A. 48-905(a), Defendant Weishaar is the "chief administrative officer" of the state's division of emergency management, and he is "under the supervision of the governor."

80.    Under K.S.A. 48-203:

The governor shall be commander in chief of the militia and shall have supreme command of the military forces of the state while in the service of the state. . . . The governor shall appoint, subject to confirmation by the senate as provided in K.S.A. 75-4315b, one adjutant general with the rank of major general, who shall be chief of staff. . . . The term of office of [the adjutant general and] officers appointed pursuant to this section shall be during *the pleasure of the governor* appointing them and until their successors are appointed and confirmed.

(Emphasis added).

81.    Under K.S.A. 48-907, Defendant Weishaar has broad powers to direct the Division of emergency management, including the powers:

- "[t]o adopt, amend and repeal rules and regulations,"

- "to supervise and direct investigations, and report to the governor with recommendations for legislation or other appropriate action as the adjutant general deems necessary, with respect to any type of activity or matter of public concern or welfare insofar as the same is or may be related to emergency management,"

- "to appoint committees to aid the adjutant general in the discharge of the powers and duties conferred,"

- "to require and direct the cooperation and assistance of state and local agencies and officials," and "to serve as the chief administrative officer," and

- "to do all acts and things, not inconsistent with law, for the furtherance of emergency management relief."

82.    Under K.S.A. 48-934, Defendant Weishaar also has the authority "during a state of disaster emergency proclaimed under K.S.A. 48-924," to exercise the "powers and duties and immunities of peace officers of the state of Kansas." That is, Defendant Weishaar and his division have police power to enforce state laws, including executive orders, during a state of disaster emergency while acting under the direct control and supervision of the governor.

83.    Defendant Weishaar also has the power to "appoint law enforcement officers to serve under the command of the adjutant general." K.S.A. 48-204(b)(5).

84.    On March 12, 2020, Governor Kelly declared a state of disaster emergency. Governor Kelly has not altered that declaration or lifted the state of disaster emergency since that date.

85.    In her March 12 declaration, Governor Kelly empowered Defendant Weishaar, as Adjutant General, to exercise "[a]ny or all of the powers conferred upon the Governor by the

Kansas Emergency Management Act" as the governor "deem[s] appropriate during this period of proclaimed State of Disaster Emergency."

86.     In her declaration, Governor Kelly declared: "I hereby proclaim, *direct and order* the Adjutant General of the State of Kansas to activate the disaster response and recovery portions of the Kansas Response Plan. The Adjutant General *shall coordinate local and inter-jurisdictional disaster plans* applicable to the political subdivisions of areas affected by this Proclamation." (Emphasis added).

87.     As Adjutant General, Defendant Weishaar is thus responsible, both directly and through his subordinates, and alongside other peace officers in the state, for enforcing the church gathering prohibition against anyone who violates it, including Plaintiffs.

88.     Defendant William Carr, the Sheriff of Ford County, Kansas, is sued in his official capacity only.

89.     Defendant Daniel E. Jackson, Jr., the Sheriff of Geary County, Kansas, is sued in his official capacity only.

90.     Pursuant to K.S.A. 48-925(c)(10) Defendants Carr and Jackson are subject to the Governor's power to *"require and direct* the cooperation and assistance of state and local governmental agencies and officials," including the enforcement of her Executive Orders, during a period of emergency declaration. (Emphasis added).

91.     Under K.S.A. 19-813, Defendants Carr and Jackson have the power during peacetime and emergencies to "keep and preserve the peace in quiet and suppress all … unlawful assemblies" in their respective counties, and to "apprehend[] or secur[e] any person" and to call other county officials to their aid in exercising that power.

92.     Defendants Carr and Jackson, as Sheriffs, also have the authority to delegate this authority among their respective undersheriffs, deputies, and other subordinates. K.S.A. 19-805.

93.     As Sheriff of Ford County, Defendant Carr has the power, both personally and through his subordinates, to enforce the church gathering prohibition against anyone in Ford County who violates it, including Plaintiff First Baptist Church.

94.     As Sheriff of Geary County, Defendant Jackson has the power, both personally and through his subordinates, to enforce the church gathering prohibition against anyone in Geary County who violates it, including Plaintiff Calvary Baptist Church.

**FACTS**
**First Baptist Church (Dodge City, Kansas)**

95.     First Baptist Church has continuously operated as a Christian church in Dodge City, Kansas since at least the 1930s.

96.     The Church is affiliated with the American Baptist denomination.

97.     First Baptist Church and Pastor Ormord believe that the Bible is the inspired Word of God and the sole authority for faith and practice.

98.     They believe the Bible teaches, among other things, the requirement to gather together for corporate prayer and worship and that such assembly is necessary and good for the Church and its members' spiritual growth.

99.     The Church has a relatively small, rural congregation with an average attendance of between 50 and 75 people.

100.    Despite the Church's best efforts, it has been difficult for the church to offer an online service, and many congregants have internet bandwidth limitations or lack internet altogether and are therefore unable to participate in an on-line service.

101.    On Easter Sunday, April 12, 2020, the Church attempted to offer a "drive-in" service in its parking lot and online streaming of its service to congregants sitting in their individual cars. However, high winds and internet streaming problems made it impossible for congregants to listen to or effectively participate in the service. As a result, some congregants expressed their difficulties to the church on Facebook. Those part of the service inside the building followed its previous social distancing and health safety protocol as outlined herein during the service.

**First Baptist Church's Voluntary Response to COVID-19 Guidelines**

102.    As a response to federal, state, and local guidance at the beginning of the COVID-19 outbreak, but prior to any local or state order regarding mass gatherings, First Baptist Church voluntarily adopted rigorous social distancing and health safety protocol to protect church service attendees.

103.    In its most current form, this protocol, as outlined in Exhibit 4 (letter to Clay Britton), includes the following precautions:

- Prior to and following the in-person service, the facility will be deep cleaned;

- Invitations will be directed to regular church attendees for this in-person service;

- Individuals will be advised to continue to engage in "stay at home" protocols as directed by EO 20-16 in order to attend the service;

- No church members are known to have had any contact with known COVID-19 confirmed cases;

- Attendees will be advised to perform temperature checks at home on all attendees prior to attending the service. Individuals that are ill or have fevers will not attend;

- High-risk individuals will be advised not to attend the in-person service;

- Attendees will be advised to bring their own PPE, including masks and gloves;

- Attendees will be advised not to engage in hand shaking or other physical contact;

- Hand sanitizer will be available for use throughout the facility;

- The in-person service will be limited to 50 individuals in a space that has a capacity for 300 individuals (a cross-shaped auditorium 50 feet by 74 feet at the center; 2,950 square feet total, allowing almost 57 square feet available to each attendee at maximum social distancing);

- Co-habituating family units may sit closer together but otherwise the maximum social distancing possible will be used, however, at a minimum, the CDC-recommended protocol will be observed with a minimum distance of at least 6 feet;

- A single point of entry and single point of exit on opposite sides of the building will be used, establishing a one-way traffic pattern to ensure social distancing;

- Ventilation will be increased as much as possible, opening windows and doors, as weather permits;

- These procedures will be communicated to church members in advance of the service;

- Church bulletin and offering plates will not be used during the service;

- Attendees will be advised to wash their clothes following the service;

- If Church leadership becomes aware of a clear, immediate, and immanent threat to the safety of the attendees or cannot follow the protocols listed above, the gathering will be immediately disbanded.

104.     The Church and Pastor Ormord will continue to attempt to offer streaming services, weather and technology permitting, but seek to have the option to legally move their weekly Sunday worship service indoors if streaming services are not feasible or practicable, while practicing adequate social distancing and health safety protocol as recommended by federal, state, and local authorities, and without being subject to penalty or punishment.

### Calvary Baptist Church (Junction City, Kansas)

105.     Calvary Baptist Church has continuously operated as a Christian church in Junction City, Kansas since 1956.

106.     The Church is an independent church, not closely affiliated with any association, convention, conference, or council of churches.

107.     Calvary Baptist Church and Pastor Harris believe that the Bible is the inspired Word of God and the sole authority for faith and practice.

108.     They believe the Bible teaches, among other things, the requirement to gather together for corporate prayer and worship and that such assembly is necessary and good for the Church and its members' spiritual growth.

109.     The Church has a relatively small congregation with an average attendance of between 75 and 100 people. Although the Church's seating capacity is approximately 300, the Church will limit attendance to no more than 75.

110.     The Church offers an online streaming option for viewing its service.

111.     In order to offer an outdoor service, the Church must rent equipment on a weekly basis, including outdoor loud speakers, a tent canopy, and additional chairs.

**Calvary Baptist Church's Voluntary Response to COVID-19 Guidelines**

112.    As a response to federal, state, and local guidance at the beginning of the COVID-19 outbreak, but prior to any local or state order regarding mass gatherings, Calvary Baptist Church voluntarily adopted rigorous social distancing and health safety protocol to protect church service attendees.

113.    For example, the Church:

a.      Split out pews and marked designated sitting areas to keep non-cohabiting congregants at least six feet apart before, during, and after the worship service;

b.      Marked multiple entrances to encourage socially distanced foot traffic;

c.      Propped doors open during services to prevent the need for congregants to touch doors while entering and exiting the church or sanctuary;

d.      Suspended the passing of offering plates;

e.      Actively discouraged handshaking or other social touching;

f.      Began offering hand sanitizer throughout the building;

g.      Procured face masks to offer to any interested persons.

114.    The Church and Pastor Harris will continue to attempt to offer online streaming and outdoor services, weather and technology permitting, but seek to have the option to legally move their weekly Sunday worship service indoors when outdoor services are not feasible or practicable, while practicing adequate social distancing and health safety protocol as recommended by federal, state, and local authorities.

115.    As recently as April 15, 2020, Pastor Harris has continued to communicate with law enforcement regarding the options for legally holding in-person church services. He has been

directly warned by the Geary County Sheriff, Defendant Jackson, that any violations of EO 20-18 et seq. will be criminally enforced.

## COUNT I
### Violation of the First Amendment to the U.S. Constitution (Free Exercise)

116.    Plaintiffs incorporate by reference paragraphs 1 through 114.

117.    Plaintiffs' sincerely held religious beliefs teach that the Bible is the inspired Word of God and the sole authority for faith and practice.

118.    Plaintiffs sincerely believe that the Bible teaches the necessity of gathering together for corporate prayer and worship and that such assembly is necessary and good for the Church and its members' spiritual growth.

119.    Executive Order 20-25 substantially burdens Plaintiffs' religion by prohibiting them from holding in-person church services with more than 10 non-performing congregants.

120.    Executive Order 20-25 substantially interferes with Plaintiffs' ability to carry out their religious doctrine, faith, and mission.

121.    Executive Order 20-25 targets, discriminates against, and shows hostility towards churches, including Plaintiffs.

122.    Executive Order 20-25 is neither neutral nor generally applicable.

123.    The State does not have a compelling reason for prohibiting church services where congregants can otherwise practice adequate social distancing protocol, especially when compared to the vast secular activities exempted under the order, nor has it selected the least restrictive means to further any purported interest.

124.    Executive Order 20-25 violates the Free Exercise Clause of the First Amendment to the United States Constitution, both facially and as applied.

125.     In the absence of declaratory and injunctive relief, Plaintiffs will be irreparably harmed.

<u>**COUNT II**</u>
**Violation of the First Amendment to the U.S. Constitution (Free Speech)**

126.     Plaintiffs incorporate by reference paragraphs 1 through 114.

127.     Executive Order 20-25 violates Plaintiffs' freedom of speech by prohibiting them from engaging in religious speech through their church services, which occur exclusively on private property.

128.     Executive Order 20-25 gives government officials unbridled discretion with respect to enforcement of the order and the imposition of any penalty, making the order susceptible to both content- and viewpoint-based discrimination.

129.     Prohibiting or punishing Plaintiffs' religious speech does not serve any legitimate, rational, substantial, or compelling governmental interest.

130.     The State also has alternative, less restrictive means to achieve any interest that it might have.

131.     Executive Order 20-25 violates the Free Speech Clause of the First Amendment to the United States Constitution, both facially and as applied.

132.     In the absence of declaratory and injunctive relief, Plaintiffs will be irreparably harmed.

<u>**COUNT III**</u>
**Violation of the First Amendment to the U.S. Constitution (Right to Assemble)**

133.     Plaintiffs incorporate by reference paragraphs 1 through 114.

134.     The First Amendment prohibits the State from violating Plaintiffs' right to peaceably assemble.

135.     Executive Order 20-25 violates Plaintiffs' right to peaceably assemble because the ban on in-person services does not serve any legitimate, rational, substantial, or compelling governmental interest.

136.     In addition, the State has alternative, less restrictive means to achieve any interest that it might have.

137.     Executive Order 20-25 violates the right to assemble under the First Amendment to the United States Constitution, both facially and as applied.

138.     In the absence of declaratory and injunctive relief, Plaintiffs will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

a.  Enter a temporary restraining order, preliminary injunction, and permanent injunction prohibiting Defendants from enforcing the portion of Governor's Executive Order 20-25 limiting church public gatherings to less than 10 non-performing persons, thus allowing Plaintiffs and their congregants to continue to meet for worship while practicing adequate social distancing;

b.  Enter a judgment declaring that Governor's Executive Order 20-25 violates the U.S. Constitution's Free Exercise, Free Speech, Right to Assemble, and Due Process Clauses.

c.  Award Plaintiffs' court costs and reasonable attorney fees; and

d.  Award such other and further relief as to which Plaintiffs may be entitled.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment of the United States Constitution.

It is respectfully requested that the jury trial be held in Wichita, KS given its geographic

proximity to all plaintiffs.

Respectfully submitted this 22nd day of April 2020.

/s/ Tyson C. Langhofer
Tyson C. Langhofer
KS Bar No. 19241
ALLIANCE DEFENDING FREEDOM
20116 Ashbrook Place, Suite 250
Ashburn, VA 20147
(480) 388-8205
tlanghofer@ADFlegal.org

David A. Cortman*
GA Bar No. 188810
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@ADFlegal.org

Ryan J. Tucker*
AZ Bar No. 034382
ALLIANCE DEFENDING FREEDOM
15100 N. 90th St.
Scottsdale, AZ 85260
(480) 444-0020
rtucker@ADFlegal.org

/s/ Joshua A. Ney
Joshua A. Ney,
KS Bar No. 24077
NEY LAW FIRM, LLC
900 S. Kansas Ave., Ste. 402B
Topeka, KS 66612
 (785) 414-9065
josh@joshney.com

/s/ Ryan A. Kriegshauser
Ryan A. Kriegshauser
KS Bar No. 23942
KRIEGSHAUSER LAW LLC
15050 W. 138th St., Unit 4493
Olathe, KS 66063
(913)  303-0639
ryan@kriegshauserlaw.us


ATTORNEYS FOR PLAINTIFFS

*Admission for *Pro Hac Vice* forthcoming.

## VERIFICATION

I declare under penalty of perjury that the foregoing Amended Verified Complaint has been examined by me and that the factual allegations therein are true to the best of my information, knowledge, and belief.

Dated: April 22, 2020

Pastor Stephen Ormord
First Baptist Church

## VERIFICATION

I declare under penalty of perjury that the foregoing Amended Verified Complaint has been examined by me and that the factual allegations therein are true to the best of my information, knowledge, and belief.

Dated: April 22, 2020

Pastor Aaron Harris
Calvary Baptist Church