## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| FIRST BAPTIST CHURCH;<br>PASTOR STEPHEN ORMORD;<br>CALVARY BAPTIST CHURCH;<br>PASTOR AARON HARRIS<br><br>      Plaintiffs,<br><br>GOVERNOR LAURA KELLY,<br>in her official capacity; ADJUTANT GENERAL<br>DAVID WEISHAAR, in his official capacity;<br>GEARY COUNTY SHERIFF DANIEL E.<br>JACKSON, JR. in his official capacity; FORD<br>COUNTY SHERIFF WILLIAM CARR, in his<br>official capacity,<br><br>      Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 6:20-cv-01102 |

## PLAINTIFFS' OPPOSITION TO DEFENDANT KELLY'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................III

INTRODUCTION ............................................................................................1

RELEVANT BACKGROUND ...........................................................................3

ARGUMENT .................................................................................................5

I.  The Governor's motion should be denied because she is a properly
    named defendant under *Ex parte Young*..................................................5

    A.    The Governor has the power to enforce EO 20-25. ...................................6

    B.    That the attorney general has general law enforcement authority does not
           mean the Governor lacks the power to enforce EO 20-25....................................11

II. The Plaintiffs' lawsuit is still not moot. ...................................................15

CONCLUSION..............................................................................................16

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Day v. Bond,*
    500 F.3d 1127 (10th Cir. 2007) .................................................................. 14, 15

*Day v. Sebelius,*
    376 F. Supp. 2d 1022 (D. Kan. 2005)....................................................... 14, 15

*Ex Parte Young,*
    209 U.S. 123 (1908) ................................................................. 4 - 7, 10, 14

*Finstuen v. Crutcher,*
    496 F.3d 1139 (10th Cir. 2007) ...................................................................... 10

*Heinz v. Shawnee County Commissioners,*
    136 Kan. 104, (1932) ................................................................................... 14

*In re Abbott,*
    2020 WL 1911216 (5th Cir. Apr. 20, 2020) ..................................................... 10

*Memorial Hospital Association, Inc. v. Knutson,*
    722 P.2d 1093 (Kan. 1986)............................................................................ 14

*Northeastern Florida Chapter, Associated General Contractors of*
    *America v. Jacksonville,*
    508 US 656 (1993) ........................................................................................ 16

*Petrella v. Brownback*, 697 F.3d 1285 (10th Cir. 2012) .......................................... 8, 9

*Prairie Band Potawatomi Nation v. Wagnon,*
    476 F.3d 818 (10th Cir. 2007) ................................................................... 7 - 9

*Robinson v. Kansas,*
    295 F.3d 1183 (10th Cir.2002) ....................................................................... 9

*Muscogee (Creek) Nation v. Pruitt,*
    669 F.3d 1159 (10th Cir.2012) ...................................................................... 9

*South Carolina Wildlife Federation v. Limehouse,*
    549 F.3d 324 (4th Cir. 2008)...................................................................... 7, 8

*State v. Dawson,*
    119 P. 360 (Kan. 1911) ...................................................................... 14

*State v. Finch*,
    128 Kan. 665, (1929) ........................................................................ 14

*VanSickle v. Shanahan,*
    511 P.2d 223 (Kan. 1973) ................................................................... 1

## **Statutes**

Kan. Const. art. I, § 3 ............................................................................ 3

Kan. Const. art. VIII, § 4 ........................................................................ 3

K.S.A. 19-813 ...................................................................................... 14

K.S.A. 48-203 ................................................................................. 11, 12

K.S.A. 48-204 ...................................................................................... 12

K.S.A. 48-907 ...................................................................................... 12

K.S.A. 48-924 .................................................................................10, 15

K.S.A. 48-925 .......................................................... 2 - 4, 6, 7, 10, 11, 15

K.S.A. 48-932 ...................................................................................... 10

K.S.A. 48-934 ...................................................................................... 12

K.S.A. 48-939 ...................................................................................... 10

K.S.A. 75-702 ...................................................................................... 14

## **Other Authorities**

Montesquieu, *The Spirit of the Law* I 35 (vol. 7, Thatcher ed.,
    The Ideas that Have Influenced Civilization) ................................................1

## INTRODUCTION

Governor Laura Kelly has declared a statewide public health emergency to respond to a global pandemic. That declaration has been ratified by the legislature, and she has now assumed the full force and might of the state's executive power over all 105 counties. By law, her power to direct the state's law enforcement community in its execution of the state's criminal laws is supreme and total. In no other legal moment is the full force and effect of Article I, Section 3 of the Kansas Constitution so purely distilled: "The supreme executive power of this state shall be vested in a governor, who shall be responsible for the enforcement of the laws of this state."

Pursuant to K.S.A. 48-924 and 925, Kansas Governor Laura Kelly has assumed extraordinary *legislative* and *executive* functions of the state government that in ordinary times would be anathema to a democratic republic.[1] But, these are not ordinary times.

As a result of her legislatively ratified emergency declaration under K.S.A. 48-924, Governor Kelly has temporarily assumed the *legislative* function of a one-woman legislature. Under K.S.A. 48-925(b), she "may issue orders and proclamations which shall have the force and effect of law during the period of a state of disaster emergency."

---

[1]"When the legislative and executive powers are united in the same person, or in the same body of magistrates, there can be no liberty; because apprehensions may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner." *VanSickle v. Shanahan,* 511 P.2d 223, 239 (Kan. 1973) (citing Montesquieu, *The Spirit of the Law* (7, Thatcher Editor, The Ideas that Have Influenced Civilization, p. 35).

But more fundamentally—via the merger of the Governor's constitutional "supreme executive power" with the statutory suspension of the distribution of executive power within the administrative state and its subsidiary local elected officials—she has assumed the extraordinary powers of a *unitary executive* pursuant to K.S.A. 48-925(a) and (c). During a ratified emergency, she is constitutionally and statutorily the "commander-in-chief of the organized and unorganized militia and of all other forces available for emergency duty." *See* K.S.A. 48-925(a). With her assumed domestic powers during a statewide emergency, she may:

- **require and direct the cooperation and assistance of state and local governmental agencies and officials;**

- commandeer or utilize any private property in the state;

- utilize all resources of the state government and local units of government;

- rearrange the "supervision, personnel or functions" of the state's executive agencies to engage in emergency management activities;

- direct and compel the evacuation of any part of the state;

- control the movement and occupancy of persons and animals within the state; and

- command the state's resources to provide temporary emergency housing;

*See id.* at (c)(2), (3), (4), (5), (7), (9) and (10) (emphasis added). This list of her emergency executive powers is not exhaustive. *See id.* at (c)(11).

2

The key to deciding whether this federal court has jurisdiction under the Eleventh Amendment to restrain her from enforcing her church gathering ban, and specifically, whether Governor Laura Kelly has "some connection with the enforcement" of the Executive Order 20-25 ("EO 20-25"), lies in considering the governor's extraordinary executive powers as outlined above. *Ex Parte Young*, 209 U.S. 123, 157 (1908) (under the Eleventh Amendment, an enjoined state executive officer "must have some connection with the enforcement of the act"). When considering the constitutional background of this statutory grant of executive prerogative, it is clear that the Governor is the proper—and principal—law enforcement official to be enjoined. *See Petrella v. Brownback*, 697 F.3d 1285, 1293–94 (10th Cir. 2012) (when the constitutionality of a state law is challenged where only prospective, non-monetary relief is sought, the Governor is a proper party, along with other state officials responsible for the enforcement of that statute) (discussing *Ex parte Young*, 209 U.S. at 161).

Governor Kelly is the chief law enforcement officer generally during peacetime, and has consolidated enforcement power during a declared emergency. She maintains directive and complete control over the state's military personnel and state and local peace officers. She has *complete* connection with the enforcement of EO 20-25, and she must be enjoined from directing the arrests of persons safely gathering for church or other religious activities.

## RELEVANT BACKGROUND

Under Article I, Section 3 of the Kansas Constitution, "the supreme executive power of this state shall be vested in [Governor Kelly], who shall be responsible for

the enforcement of the laws of this state." No other executive officer is vested *constitutionally* with law enforcement power. In addition, under Article VIII, Section 4 of the Kansas Constitution, Governor Kelly has the "power to call out the militia to execute the laws," including executive orders. Under the Kansas Constitution, the Governor is clearly the ultimate executive officer in the State of Kansas with the duty to enforce Kansas law.

What is more, Governor Kelly has broad legislative and executive authority during states of disaster emergency. The Kansas Emergency Management Act (KEMA) grants the Governor the authority to "*require* and *direct* the cooperation and assistance of state and local governmental agencies and officials," including ordering enforcement of EO 20-25. K.S.A. 48-925(c)(10) (emphasis added). In addition, KEMA gives her the legislative power to "issue orders and proclamations which shall have the force and effect of law during the period of a state of disaster emergency." K.S.A. 48-925(b). And it provides that, "[d]uring any state of disaster emergency," she is the "commander-in-chief of the organized and unorganized militia and all other forces available for emergency duty." K.S.A. 48-925(a). While the Governor shall, "[t]o the greatest extent practicable," "delegate or assign command authority by prior arrangement, embodied in appropriate executive orders," nothing "shall restrict [her] authority to do so by orders issued at the time of a disaster." *Id.*

Given this framework, Governor Kelly has exercised her *legislative* power during this state of emergency by issuing the prohibitions and regulations in EO 20-

25. And by ordering and directing enforcement of EO 20-25, Governor Kelly has exercised her *executive* power by enforcing (and promising to enforce) those same prohibitions and regulations.

## ARGUMENT

### I. The Governor is a properly named defendant under *Ex parte Young* because she is vested with the emergency power to enforce her orders.

The Governor seeks dismissal from and of this suit pursuant to the sovereign immunity provision of the Eleventh Amendment.[2] Under *Ex Parte Young*, this Court has jurisdiction to enjoin the Governor for issuing unconstitutional legislative emergency proclamations when she has some "connection to the enforcement" of such proclamations. 209 U.S. at 157. When the challenged state official is vested with such enforcement power she is subject to an injunctive remedy. *Id*.

The Governor argues in her motion that she must be dismissed as a party because she lacks the power and authority to enforce her own executive orders during an emergency. Different court, different tune. Just two weeks ago, the Governor rightly claimed before the Kansas Supreme Court that during a declared emergency under K.S.A. 48-924, her "authority is at its maximum." *See* Memo. in Supp. of Pet. in Quo Warranto at 8, *Kelly v. Legislative Coordinating Council*, Case

---

[2] Given that Plaintiffs have amended their complaint to include other state and local officials with authority to enforce the Governor's church gathering ban against the Plaintiffs, the Governor's motion cannot result in complete dismissal of this lawsuit. By adding additional government officials who also possess law enforcement authority subject to and concurrent with the Governor's supreme law enforcement power, such officials must be enjoined from enforcing an Executive Order, which falls afoul of the First Amendment. In any event, a dismissal of the Governor from this lawsuit should not affect the court's jurisdiction to prohibit the enforcement of her unconstitutional church ban against the remaining Defendants.

No. 122,765 (Kan.). Certainly, her newly adopted *legislative* function is at its maximum pursuant to K.S.A. 48-925(b).

But this power to decree law pales in comparison to her power to *enforce* such decrees during a period of emergency under K.S.A. 48-925(a) and (c). It is inexplicable, then, that the Governor fails to mention these new, consolidated law enforcement powers under K.S.A. 48-925(a) and (c) *anywhere* in her motion to dismiss, except for the illogical proposition that her executive powers (e.g., commandeer or utilize any private property in the state; utilize all resources of the state government and local units of government; require and direct the cooperation and assistance of state and local governmental agencies and officials) are somehow *limited* to her temporary legislative powers. *See* MTD at 7 (incorrectly suggesting that the extent of her powers in K.S.A. 48-925(a) and (c) are limited by K.S.A. 48-925(b).)

The Governor cannot have it both ways. She cannot claim the maximum extent of her *executive and legislative* powers when making sweeping legislative decrees and marshalling the full might of the state's military, administrative, and law enforcement officers to meet a public health emergency, and then attempt to hide behind the "discretion" of local law enforcement officers when she has gone too far.

## A. The Governor has the supreme power to enforce EO 20-25.

When a state law is challenged as unconstitutional, a defendant must have "some connection with the enforcement of the act" to properly be a party to the suit. *Ex Parte Young*, 209 U.S. at 157. This requirement merely ensures that the proper

party is before the federal court. *Id.* at 158–59. Thus, it has primarily been "a bar to injunctive actions where the relationship between the state official sought to be enjoined and the enforcement of the state statute is significantly attenuated." *S. Carolina Wildlife Federation v. Limehouse*, 549 F.3d 324, 333 (4th Cir. 2008). As the Fourth Circuit put it, the requirement "serve[s] as a measure of *proximity to* and *responsibility for* the challenged state action." *Id.* (emphasis in original). In other words, it "ensures that a federal injunction will be effective with respect to the underlying claim." *Id.*

The Tenth Circuit takes a similar approach. To fall within the *Ex Parte Young* exception to Eleventh Amendment immunity, plaintiffs must show only that the named officials have "some connection" to the enforcement of the challenged law. *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir. 2007). Plaintiffs therefore need not establish a "special connection" between the named officials and EO 20-25. *Id.* In fact, the named officials need not even be "specifically empowered to ensure compliance with the statute at issue." *Id.* It is enough that they "currently assist in giving effect to the law." *Id.*

In *Prairie Band*, a Native American tribe sued various Kansas state officials, including the Superintendent of the Kansas Highway Patrol, to force the state to recognize motor vehicle registrations and titles issued by the tribe. *Id.* at 820. Like the Governor does here, the Kansas officials denied a sufficient connection between themselves and the challenged law because they were "not specifically empowered to enforce the state statute in question." *Id.* at 828. The Tenth Circuit disagreed,

explaining that the officials need not be "specifically empowered" to enforce the law as long as they were responsible for "giving effect" to the law. *Id.*

Under that general standard, the Tenth Circuit has specifically opined that the Kansas Governor *is a proper party* under *Ex Parte Young* where injunctive relief is sought against the enforcement of an unconstitutional state law. *Petrella v. Brownback*, 697 F.3d 1285, 1293-1294 (10th Cir. 2012). In *Petrella* , Kansas Governor Sam Brownback was a party to a lawsuit challenging the constitutionality of the state's school finance law along with several other Kansas executive branch officials, including the commissioner of education, all the members of the state board of education, the Kansas Attorney General, and the Kansas State Treasurer. *Id.* When the Governor and other executive branch officials sought to be dismissed from the suit based on a purported lack of causation between the Governor's enforcement power and the alleged constitutional injury, the court summarily concluded:

> It cannot seriously be disputed that the proper vehicle for challenging the constitutionality of a state statute, where only prospective, non-monetary relief is sought, is an action against the state officials responsible for the enforcement of that statute. See *Ex parte Young*, 209 U.S. 123, 161, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Nor can it be disputed that the Governor and Attorney General of the state of Kansas have responsibility for the enforcement of the laws of the state. See Kan. CONST. Art. I § 3; Kan. Stat. Ann. § 75–702. And this Court has already held, in another challenge to Kansas's school finance scheme, that the state school board officials and Commissioner of Education are proper defendants in such a suit. See *Robinson v. Kansas*, 295 F.3d 1183, 1191 (10th Cir.2002), abrogated on other grounds by *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159 (10th Cir.2012).

*Id.*

Like Governor Brownback in *Petrella*, Governor Kelly is a proper party to this suit for injunctive relief. Not only is Governor Kelly vested with the "responsibility for enforcement of laws of the state," but she is also particularly "empowered" to enforce EO 20-25 and is undeniably responsible for "giving effect" to it. *See id.*; *Prairie Band*, 476 F.3d at 828.

Moreover, Plaintiffs' basis for including Governor Kelly as the principal defendant in this case is not simply due to the fact that she has enforcement power over her own emergency executive orders, nor even that she has expressed a willingness to enforce, but fundamentally that she already has employed her executive powers to enforce her decrees of law. Indeed, the Governor has plainly "direct[ed] and order[ed]" law enforcement authorities to enforce EO 20-25.[3] And in so doing, she has relied on both her constitutional and emergency statutory powers. *See* EO 20-25 at 2 ("NOW, THEREFORE, pursuant to the authority vested in me as Governor of the State of Kansas, including the authority granted me by K.S.A 48-924 and K.S.A 48-925, in order to slow the spread of COVID-19, I hereby *direct* and *order* . . . .").

In other words, the Governor did not merely issue EO 20-25 pursuant to her *legislative* powers under K.S.A. 48-925(b), but instead did so pursuant to her *executive* powers under 48-925(a). These executive powers include her power over

---

[3] The Governor asserts that because EO 20-25 references local officials' enforcement authority and discretion (but not the Governor's), she cannot have any enforcement authority of her own. But it is well-established that a defendant need not be identified in the challenged statute itself to fit within the *Ex parte Young* exception. *See Finstuen v. Crutcher*, 496 F.3d 1139, 1151 (10th Cir. 2007) ("[I]t is not necessary that the officer's enforcement duties be noted in the act.") (citation omitted).

the adjutant general and state militia as commander-in-chief as well as her power to "require and direct the cooperation and assistance of state and local governmental agencies and officials" to enforce her orders. K.S.A. 48-925(c)(10).

It should also not escape attention that the major criminal enforcement provision cited for a violation of EO 20-25 is contained in KEMA and is directly based on the Governor's orders. K.S.A. 48-939 states:

> The knowing and willful violation of any provision of this act or any rule and regulation adopted by the adjutant general under this act or any lawful order or proclamation issued under authority of this act whether pursuant to a proclamation declaring a state of disaster emergency under K.S.A. 48-924 or a declaration of a state of local disaster emergency under K.S.A. 48-932, shall constitute a class A misdemeanor and any person convicted of such violation shall be punished as provided by law therefor.

Accordingly, after utilizing her legislative powers to issue an order, KEMA has a criminal penalty derivative of the Governor's authority that also vests her, and others, including those she directs, with the ability to enforce her order criminally. This interaction between the Governor's legislative and executive powers is at the core of "giving effect" to the law.

In this way, then, Governor Kelly's powers diverge significantly from the executive powers addressed by the court in *In re Abbott*, 2020 WL 1911216 (5th Cir. Apr. 20, 2020). There, the Texas governor had only the power to "issue," "amend," or "rescind" executive orders; he could not "enforce" them. *Id.* at *6. In stark contrast, under KEMA, Governor Kelly has the power to enforce EO 20-25. She is not simply equipped with the executive machinery over which she employs direct control in peacetime, i.e. the state highway patrol, the capitol police, the adjutant general, and

10

the state militia. Rather, during a period of emergency, she may directly employ the full might of the Kansas executive branch, including the power to direct state and local law enforcement in the enforcement of her decrees.

### B. The Governor has enforcement powers directly and through her deputies, including the Kansas Adjutant General.

The Adjutant General, as the Governor's main deputy in an Emergency, has enhanced enforcement abilities and is charged with the enforcement of the Governor's orders. In an emergency, the Governor of Kansas is the "commander-in-chief of the organized and unorganized militia and of all other forces available for emergency duty." K.S.A. 48-925(a). In fact, the Governor's command is "supreme" over the military forces of the state. K.S.A. 48-203. As the Adjutant General is appointed by the Governor with Senate confirmation and serves at the pleasure of the governor, he is under the Governor's direct control and influence. K.S.A. 48-203; *see also* K.S.A. 48-905(a). The Adjutant General is the head of both the Kansas National Guard and the state militia. Normally, he has the ability to appoint qualified law enforcement officers to serve under his command. K.S.A. 48-204(b)(5). However, during a time of emergency, the Adjutant General's law enforcement powers become even more pronounced. Under KEMA, military personnel, in addition to law enforcement officers, are granted power to enforce emergency orders. K.S.A. 48-934 states:

> "Law enforcement officers, *military personnel*, or other persons authorized to assist them, while engaged in maintaining or restoring the public peace or safety or in the protection of life or property *during a state of disaster emergency proclaimed under K.S.A. 48-924, shall have all powers duties and immunities of peace officers of the state of*

*Kansas in addition to all powers, duties and immunities now otherwise provided by law.*"

Additionally, the Adjutant General has derivative powers to direct local law enforcement officials to assist in the enforcement the Governor's Orders under KEMA. K.S.A. 48-907(g). In an emergency, he even has the authority to "supervise and direct investigations" related the public welfare and his emergency management role, reporting directly to the Governor. K.S.A. 48-907(e).

In her March 12 declaration, Governor Kelly empowered Defendant Weishaar, as Adjutant General, to exercise "[a]ny or all of the powers conferred upon the Governor by the Kansas Emergency Management Act" as the governor "deem[s] appropriate during this period of proclaimed State of Disaster Emergency."[4] In her declaration, Governor Kelly declared: "I hereby proclaim, *direct and order* the Adjutant General of the State of Kansas to activate the disaster response and recovery portions of the Kansas Response Plan. The Adjutant General *shall coordinate local and interjurisdictional disaster plans* applicable to the political subdivisions of areas affected by this Proclamation." (Emphasis added). Accordingly, the Adjutant General has been fully vested with his emergency powers and is able to act as a peace officer throughout the State of Kansas. Similar to the Governor's own description of her emergency powers, the Adjutant General's powers are also at a "maximum" in a state of emergency.

---

[4] A copy of the Governor's Disaster Declaration is available at https://governor.kansas.gov/wp-content/uploads/2020/03/2020-03-12-Proclamation.pdf

Under KEMA, the Adjutant General serves as the coordination "hub" in an emergency and is given broad powers, both executively and legislatively. Because of this, he and his agency have the power to enforce the Governor's Executive Orders and have been instructed to work with local political subdivisions. Given the close supervision and supreme command of the Governor, the Adjutant General is specially situated to enforce the Governor's orders, particularly in times of emergency.

## C. The Governor, not the Attorney General, is the "chief law enforcement officer" of Kansas.

The Governor also argues for dismissal because Kansas courts generally consider the Kansas attorney general to be the "chief law enforcement officer of the state." MTD at 4, 9 (citations omitted). While this traditional designation for the attorney general is a convenient legal fiction, and is appropriate and controlling in times of peace, it flies too close to the constitutional sun during an emergency.[5] "The

---

[5]*See Meml. Hosp. Ass'n, Inc. v. Knutson*, 722 P.2d 1093, 1097 (Kan. 1986):

> The attorney general's powers are as broad as the common law unless restricted or modified by statute. *State v. Finch*, 128 Kan. 665, 280 Pac. 910 (1929). Our scheme of government provides for a county or district attorney as a law officer for each county and the attorney general as the law officer for the entire state. *Heinz v. Shawnee County Comm'rs*, 136 Kan. 104, 12 P.2d 816 (1932). It is the attorney general who appears for the state and prosecutes and defends all actions and proceedings, civil or criminal, in which the state is interested or is a party in the supreme court. The attorney general is the chief law officer, ***subject only to direction of the governor*** and the legislature.

(Emphasis added). *See also* K.S.A. 75-702 (when required by the governor, attorney general must appear in court to prosecute civil or criminal matters in which state is a party); *State v. Dawson*, 119 P. 360 (Kan. 1911) (the governor has broad executive authority to direct the Attorney General in certain circumstances).

supreme executive power of this state shall be vested in a governor, who shall be responsible for the enforcement of the laws of this state." Kan. CONST. Art. I, § 3.[6]

The only express constitutional grant of law enforcement power is in the governor and the governor alone. The legislature has distributed the responsibility to enforce law in peacetime among various constitutional, appointed, and elected officials at the state and local level. *See e.g.* K.S.A. 19-813 (criminal law enforcement authority of sheriffs). But it nevertheless vests the governor alone with the constitutional law enforcement power. Admittedly, "[t]his general enforcement power [during peacetime] is not sufficient to establish the connection to the statute required to meet the *Ex parte Young* exception to Eleventh Amendment immunity" if "the Governor has no involvement with the enforcement of [a particular law]." *Day v. Sebelius*, 376 F. Supp. 2d 1022, 1031 (D. Kan. 2005), aff'd sub nom. *Day v. Bond*, 500 F.3d 1127 (10th Cir. 2007).

However, during periods of emergency, the legislature has by law *reconsolidated* the chief law enforcement power in the governor. As detailed above, KEMA consolidates all the supreme law enforcement power of the state in the Governor during a time of emergency by activating her specific constitutional powers as commander-in-chief and conveying power to direct all other law enforcement. *See supra* at 1. That is why this grant of special executive and

---

[6] It should also be noted that the Governor continued to threaten the enforcement of EO 20-18 after being notified by the Attorney General that her order was likely unconstitutional in his memorandum to law enforcement. *See* Amended Complaint, Exhibit 4 (Doc. 33-4). This action included filing suit against the Legislative Coordinating Counsel to maintain her criminal enforcement power. *Id.* , ¶¶ 8-11. Indeed, even after this Court issued the Temporary Restraining Order in this case, the Governor announced that EO 20-25 was in effect and would be enforced. *Id.*, ¶ 27.

legislative powers to the Governor is strictly limited in time: the legislature must "activate" these powers by ratification, or she must resort to 30-day renewals of this extreme executive power. *See* K.S.A. 48-924(b). The Governor's power during times of emergency is awesome and vast.

Notably, none of the cases referenced by the Governor that designate the attorney general as the "chief law enforcement officer" arose during a state of emergency or involve the governor's exercise of emergency powers. Nor do they give this Court a complete picture of the governor's authority in disaster situations like this one. By enacting K.S.A. 48-925, the legislature *by law* has suspended the ordinary distribution of law enforcement power among the state's constitutional and statutory executive officers. During periods of emergency, the Governor's law enforcement authority is supreme pursuant to K.S.A. 48-925. And nothing in the constitution, aside from the people's inalienable rights, challenges this proposition.

## II.   Plaintiffs' suit—and the criminalization of church—is still not moot.

In her motion, Governor Kelly renews her contention that this lawsuit is moot and should be dismissed because the complaint "seeks injunctive and declaratory relief only as to EO 20-18," which was "rescinded and replaced" by EO 20-25. MTD at 7. This Court should again deny the argument for three reasons.

First, the Governor has failed to justify why this Court should reverse its earlier ruling on this issue. Second, the Supreme Court has made clear that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice . . .  because the defendant's repeal of the objectionable language would not preclude it from

15

reenacting precisely the same provision if the District Court's judgment were vacated." *Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville*, 508 US 656, 662 (1993). To be sure,

> [here,] there is no mere risk that [the Governor] will repeat [her] allegedly wrongful conduct; [she] has already done so. Nor does it matter that the new ordinance differs in certain respects from the old one. *City of Mesquite* does not stand for the proposition that it is only the possibility that the selfsame statute will be enacted that prevents a case from being moot; if that were the rule, a defendant could moot a case by repealing the challenged statute and replacing it with one that differs only in some insignificant respect. The gravamen of petitioner's complaint is that its members are disadvantaged in their efforts to [hold a church service]. The new ordinance may disadvantage them to a lesser degree than the old one, but . . . it disadvantages them in the same fundamental way.

*Id.* at 662. Finally, the Plaintiffs have filed an amended complaint now referencing and challenging EO 20-25. (*See* Doc. 33). The amended complaint moots the Governor's mootness argument.

## **CONCLUSION**

For the foregoing reasons, Defendant's motion to dismiss for lack of subject matter jurisdiction should be denied.

Respectfully submitted this 23rd day of April, 2020.

/s/ Tyson C. Langhofer
Tyson C. Langhofer
KS Bar No. 19241
ALLIANCE DEFENDING FREEDOM
20116 Ashbrook Place, Suite 250
Ashburn, VA 20147
Telephone: (316) 265-8800
tlanghofer@ADFlegal.org


David A. Cortman
GA Bar No. 188810
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
Telephone: (770) 339-0774
dcortman@ADFlegal.org


Ryan J. Tucker
AZ Bar No. 034382
ALLIANCE DEFENDING FREEDOM
15100 N. 90th St.
Scottsdale, AZ 85260
Telephone: (480) 444-0020
rtucker@ADFlegal.org

/s/ Joshua A. Ney
Joshua A. Ney,
KS Bar No. 24077
NEY LAW FIRM, LLC
900 S. Kansas Ave., Ste. 402B
Topeka, KS 66612
Telephone: (785) 414-9065
josh@joshney.com


/s/ Ryan A. Kriegshauser
Ryan A. Kriegshauser
KS Bar No. 23942
KRIEGSHAUSER LAW LLC
15050 W. 138th St., Unit 4493
Olathe, KS 66063
Telephone: (913) 303-0639
ryan@kriegshauserlaw.us


*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 23, 2020, I caused the foregoing to be filed with the Clerk of the Court using the ECF system, which will provide electronic copies to counsel of record.

<u>/s/ Tyson C. Langhofer</u>
Tyson C. Langhofer
KS Bar No. 19241
ALLIANCE DEFENDING FREEDOM
20116 Ashbrook Place, Suite 250
Ashburn, VA 20147
Telephone: (480) 388-8205
tlanghofer@ADFlegal.org