IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

FIRST BAPTIST CHURCH;
PASTOR STEPHEN ORMORD;
CALVARY BAPTIST CHURCH; and
PASTOR AARON HARRIS,

        Plaintiffs,

v.                                                   No. 20-1102-JWB

GOVERNOR LAURA KELLY,
*in her official capacity*; ADJUTANT GENERAL
DAVID WEISHAAR, *in his official capacity*;
GEARY COUNTY SHERIFF DANIEL E. JACKSON,
JR., *in his official capacity*; and
FORD COUNTY SHERIFF WILLIAM CARR, *in his
official capacity,*

        Defendants.

**MEMORANDUM AND ORDER**

This matter is before the court on Defendant Governor Laura Kelly's motion to dismiss (Doc. 30), Defendant Kelly's motion (or "suggestion") to dismiss Defendant William Carr (Doc. 36), and Plaintiffs' motion to modify the temporary restraining order ("TRO"). (Doc. 41.) The motions are sufficiently briefed (Doc. 43) and further briefing has been waived or is unnecessary. For the reasons stated herein, the foregoing motions are DENIED.

**I. Background and Facts**

The legal landscape of the case has been altered by the filing of Plaintiffs' amended complaint. (Doc. 33). That pleading names three additional defendants, all in their official capacities: David Weishaar, Kansas Adjutant General, Geary County Sheriff Daniel E. Jackson,

Jr., and Ford County Sheriff William Carr.  The amended complaint asserts three claims for deprivation of First Amendment rights under color of state law and seeks injunctive and declaratory relief under 42 U.S.C. § 1983.  The amended complaint omits a claim under state law that was asserted in the initial complaint.

Plaintiffs are two churches in Kansas and their respective pastors.  Defendant Laura Kelly is the Governor of the State of Kansas.  On April 16, 2020, Plaintiffs filed a verified complaint (Doc. 1) seeking relief from Executive Order ("EO") 20-18, issued by Governor Kelly on April 7, 2020.

EO 20-18 was one of a series of executive orders issued by Governor Kelly to address the ongoing COVID-19 pandemic.  The order was issued pursuant to the governor's authority granted by K.S.A. 48-924 and 48-925. (Doc. 33-1 at 3.) EO 20-18 contained numerous prohibitions, as well as a number of exemptions, relating to public and private activities. It prohibited "mass gatherings," defined as groups of ten or more people in a confined or enclosed space.  (*Id.*)  One provision stated that "[w]ith regard to churches or other religious services or activities, this order prohibits gatherings of more than ten congregants or parishioners in the same building or confined or enclosed space," excluding those individuals conducting or performing a religious service so long as they followed safety protocols, including maintaining separation of six feet (*i.e.*, social distancing).   (Doc. 33-1 at 3.) The order then set forth a list of 26 types of secular activities or facilities that were exempt from the prohibition on mass gatherings or that were subject to lesser restrictions.  (*Id.*) The exemptions included bars and restaurants, libraries, shopping malls, retail establishments, and office spaces. (Doc. 33 at 1.)

EO 20-18 superseded EO 20-14, a prior order that had exempted religious gatherings altogether from the prohibition on mass gatherings so long as attendees maintained appropriate

social distancing. (Doc. 33 at 2.) Additionally, the governor's prior statewide "stay-at-home" order, EO 20-16, expressly allowed Kansans, subject to some restrictions, to "perform or attend religious or faith-based services or activities" as an exempt "essential function." (Doc. 33-3.)

The amended complaint indicates that Plaintiffs desire to conduct religious services involving more than ten attendees but they are subject to a threat of criminal prosecution for violation of the governor's executive orders if they do so. Plaintiff Aaron Harris was allegedly told by the Geary County Sheriff on April 14, 2020, that he would be subject to criminal enforcement of the order if he conducted an indoor service with more than ten attendees. (Doc. 33 at 4.) This allegedly occurred after Kansas Attorney General Derek Schmidt advised law enforcement officers in an April 8 memo to avoid criminal enforcement of the limitation on religious services. (*Id.* at 3.) On April 15, 2020, Plaintiff First Baptist Church wrote the governor's counsel requesting an allowance for church services under restrictions similar to those applicable to secular essential activities involving mass gatherings. On April 16, 2020, the governor's counsel responded that the request was under review and that a decision would be reached soon. (Doc. 33-8.) Plaintiffs' initial complaint was thereafter filed on April 16, 2020.

On April 17, 2020, Plaintiffs filed a motion for a TRO and an expedited hearing. (Doc. 7.) Later that day, the governor signed EO 20-25, which revoked and replaced EO 20-18. (Doc. 33 at 6; Doc. 33-9.) EO 20-25 removed "libraries" and "shopping malls" from the list of exempted facilities for purposes of mass gatherings, and it added some restrictions on retail establishments and retail food establishments, but it maintained the same prohibition on religious gatherings of more than ten non-performing attendees. (Doc. 33-9 at 3.) The exempted activities and facilities not subject to the mass gathering prohibition continued to include many governmental operations, as well a number of other items, among which were included: airports, public and private schools

when used for certain purposes; childcare facilities; hotels; food pantries; detoxification centers; retail establishments (subject to requirements that customers maintain a six-foot distance and be performing essential activities or functions under EO 20-16); retail food establishments; office spaces if used for essential activities or functions under EO 20-16; manufacturing, processing, distribution, and production facilities; public transportation; and job centers. (*Id.* at 3-5.)

The court held a hearing on the motion for TRO on April 17, 2020, and issued a Memorandum and Order and TRO the following day. The TRO enjoined the governor from enforcing the restriction on the number of attendees at religious gatherings against Plaintiffs, provided Plaintiffs comply with social distancing and other safety protocols. (Docs. 14, 15.) The court denied Defendant's motion to dismiss the action for mootness. (Doc. 14 at 19.)

According to the amended complaint, after issuance of the TRO the governor released a statement to the press. Among other things, the release stated that the TRO applied only to the two Plaintiffs and that "[a]ll other religious gatherings must continue to adhere to the requirements of Executive Order 20-25 and limit gatherings to 10 or fewer attendees." (Doc. 33 at 7.) The amended complaint adds extensive allegations concerning the governor's authority to enforce orders such as EO 20-25, and it alleges the governor has directed enforcement of her executive orders and has used her executive power to enforce, or has promised to enforce, those restrictions. (Doc. 33 at 14.)

The amended complaint alleges subject matter jurisdiction in this court under 28 U.S.C. § 1331 and 1343. (Doc. 33 at 12.) Invoking 42 U.S.C. § 1983, Plaintiffs allege that the religious restriction in EO 20-25 violates their rights under the Free Exercise Clause of the First Amendment. (*Id.* at 24.) They similarly claim it violates their First Amendment rights to engage in free speech and to peaceably assemble. (*Id.* at 25-26.) Plaintiffs allege they will suffer

4

irreparable harm in the absence of declaratory and injunctive relief. The relief sought in the complaint includes, among other requests, a TRO, preliminary injunction, and permanent injunction against enforcement of the portion of EO 20-25 that prohibits more than ten attendees at religious services. (*Id.* at 26.)

In issuing the TRO, the court found the exercise of jurisdiction was proper under *Ex Parte Young*, 209 U.S. 123 (1908). (Doc. 14 at 4.) In *Ex Parte Young*, the Supreme Court recognized an exception to a State's Eleventh Amendment immunity for certain suits seeking injunctive relief to prevent a state officer from enforcing an unconstitutional act. (Doc. 14 at 4.)

At a subsequent telephonic hearing, the court notified the parties of the Fifth Circuit's recent decision in *In re Abbott*, No. 20-50296, 2020 WL 1911216, at *6 (5th Cir. Apr. 20, 2020). The Fifth Circuit concluded the *Ex Parte Young* exception was inapplicable to the governor of Texas because although he was empowered to "issue," "amend," or "rescind" executive orders, under Texas law he had no authority to "enforce" them. *Id.* As such, he did not have a connection to enforcement of the orders to satisfy the *Ex Parte Young* exception and was immune from suit in federal court.

Defendant thereafter filed a motion to dismiss that asserts this suit is barred by Eleventh Amendment immunity. (Doc. 30 at 1.) Defendant Kelly thereafter filed a motion to dismiss Defendant Carr. (Doc. 36). Plaintiffs have filed a response. (Doc. 43.)

**II. Defendant Kelly's Motion to Dismiss (Doc. 30.)**

Governor Kelly moves to dismiss on the basis of Eleventh Amendment immunity, arguing she lacks the "particular duty to enforce" EO 20-25 that is required for the *Ex Parte Young* exception to apply. (Doc. 30 at 3.) The motion also seeks dismissal of Plaintiffs' claim arising

5

under state law. The latter request is now moot, as Plaintiffs have omitted the state law claim from their amended complaint.

The court is guided in its analysis and its ultimate decision by the following words from *Ex Parte Young*:

> "It is most true that this court will not take jurisdiction if it should not; but it is equally true that it must take jurisdiction if it should. The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the Constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the Constitution. Questions may occur which we would gladly avoid, but we cannot avoid them. All we can do is to exercise our best judgment, and conscientiously to perform our duty."

209 U.S. at 123 (quoting *Cohens v. State of Virginia*, 19 U.S. 264, 404 (1821)).

   A. *Standards for the Ex Parte Young exception.*

The Eleventh Amendment provides in part that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against any one of the United States by Citizens of another State…." U.S. Const. amend. XI. The Supreme Court has extended the sovereign immunity recognized by this amendment to suits against a State by its own citizens. *Edelman v. Jordan,* 415 U.S. 651, 663 (1974). There are exceptions to this immunity, including one recognized in *Ex Parte Young*, which allows certain suits against individual state officers acting in their official capacity if the complaint alleges an ongoing violation of federal law and the plaintiff seeks prospective relief. *Levy v. Ks. Dept. of Soc. and Rehab. Svcs.,* 798 F.3d 1164, 1169 (10th Cir. 2015).

*Ex Parte Young* involved a preliminary injunction against the attorney general of Minnesota to prevent him from instituting any action or enforcing penalties against the plaintiffs for their violation of certain railroad commission orders enacted under Minnesota law. The

6

plaintiffs claimed the commission's orders deprived them of due process and other federal constitutional rights. When the attorney general disobeyed the federal court's injunction, he was found in contempt. He sought a writ of habeas corpus in the Supreme Court, arguing the federal court did not have jurisdiction because he was entitled to Eleventh Amendment immunity. *See Ex Parte Young,* 209 U.S. at 126-34.

The Supreme Court first found that the subject matter jurisdiction of the federal court was proper because the case involved questions under the Constitution of the United States. *Id.* at 145. It next found the Minnesota acts were unconstitutional. *Id.* at 148. As for Eleventh Amendment immunity, the Court found that "individuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected [by] an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action." *Id.* at 156. The court cautioned, however, "it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party." *Id.* at 157. Such a connection was required, otherwise "the constitutionality of every act passed by the legislature could be tested by a suit against the governor and the attorney general, based upon the theory that the former, as the executive of the state, was, in a general sense, charged with the execution of all its laws, and the latter, as attorney general, might represent the state in litigation involving the enforcement of its statutes." *Id.* That would be a "convenient" way of obtaining a resolution, but it would be inconsistent with Eleventh Amendment immunity. *Id.* At the same time, it is not necessary that a duty of enforcement be declared in the same act which is to be enforced. "The fact that the state officer, by virtue of his office, has some connection with the enforcement of the act,

7

is the important and material fact, and whether it arises out of the general law, or is specially created by the act itself, is not material so long as it exists." *Id.* The required connection may exist not only where the official has an express duty to enforce the provision, but also where the official has complete discretion as to whether or not to attempt enforcement of the law. *Id.* at 158-59. As for the Minnesota attorney general:

> It would seem to be clear that the attorney general, under his power existing at common law, and by virtue of these various statutes, had a general duty imposed upon him, which includes the right and the power to enforce the statutes of the state, including, of course, the act in question, if it were constitutional. His power by virtue of his office sufficiently connected him with the duty of enforcement to make him a proper party to a suit of the nature of the one now before the United States circuit court.

*Id.* at 161. The Supreme Court ultimately found the attorney general was not shielded by Eleventh Amendment immunity and dismissed his petition.

The recent *Abbott* decision holding that the Texas governor had no connection to enforcement of his executive orders was based on that governor's specific powers under Texas law and the case law of the Fifth Circuit. Whether Governor Kelly has the required connection to enforcement of her executive orders depends upon the particulars of Kansas law and on Tenth Circuit authority applying *Ex Parte Young*.

The Tenth Circuit has applied *Ex Parte Young* to suits involving state governors on several occasions. In *Kitchen v. Herbert,* 755 F.3d 1193 (10th Cir. 2014), same-sex couples sued the Utah governor, attorney general, and a county clerk, claiming Utah's constitutional and statutory prohibitions on same-sex marriage violated their constitutional rights. A district court granted summary judgment to the plaintiffs. On appeal, the Tenth Circuit addressed whether the governor and attorney general had standing to appeal. That issue turned in part on whether these officials possessed authority to enforce the challenged provisions, an inquiry that is "related to whether,

under *Ex Parte Young,* they are proper state officials for suit." *Id.* at 1201.[1] The court noted that under *Ex Parte Young*, an officer "need not have a special connection to the allegedly unconstitutional statute; rather, he need only have a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Id.* (quoting *Chamber of Comm. of the U.S. v. Edmondson,* 594 F.3d 742, 760 (10th Cir. 2010)).

The court in *Kitchen* found the governor had the requisite connection to enforcement, pointing, among other things, to the Utah constitution, which vests the governor with the entire executive power of the state. *Id.* at 1203. The court also noted statutory provisions giving the governor supervisory authority over all executive officers. *Id.* at 1202. Those provisions allowed the governor to require the attorney general to aid any county attorney or district attorney in the discharge of their duties or in the prosecution of any clerk that violated the challenged provisions. *Id.* at 1202. The court also found the governor had demonstrated a willingness to exercise his duty to ensure that clerks and state officials enforced the prohibition, noting the governor had "coordinated state agencies' response to the district court's order," by informing his cabinet that agencies facing conflicting laws should consult with an assistant attorney general, and if there were no conflicting laws "you should conduct business in compliance with the federal judge's ruling" until an appeal was decided. *Id.* at 1203. "Thus, state agencies with responsibility for the recognition of out-of-state marriages are being directed by the Governor in consultation with the Attorney General." *Id.* Ultimately, the Tenth Circuit concluded "the Governor's and the Attorney General's actual exercise of supervisory power and their authority to compel compliance from county clerks and other officials provide the requisite nexus between them and" the challenged provision. *Id.* at 1204.

---

[1] *See also Cressman v. Thompson,* 719 F.3d 1139, 1146 (10th Cir. 2013) (noting relationship between standing and *Ex Parte Young*).

In *Petrella v. Brownback,* 697 F.3d 1285 (10th Cir. 2012), a suit challenging the constitutionality of a school financing law was brought against the Kansas governor and attorney general. The Tenth Circuit brushed aside a challenge to the plaintiffs' standing to sue these defendants: "It cannot seriously be disputed that the proper vehicle for challenging the constitutionality of a statute, where only prospective, non-monetary relief is sought, is an action against the state officials responsible for enforcement of that statute. [citing *Ex Parte Young*]. Nor can it be disputed that the Governor and Attorney General of the state of Kansas have responsibility for the enforcement of the laws of the state. *See* Kan. Const. Art. I § 3; Kan. Stat. Ann. § 75-702." *Id.* at 1294. Specifically, Article I Section 3 of the Kansas Constitution states that the governor "shall be responsible for the enforcement of the laws of this state."

In *Bishop v. Oklahoma,* 333 F. App'x 361 (10th Cir. 2009), the suit involved a challenge by same-sex couples to Oklahoma's constitutional prohibition on same-sex marriage. The Tenth Circuit concluded the plaintiffs lacked standing to sue the governor and attorney general of the state under *Ex Parte Young* because those officials had no connection to enforcement of the provision. The court noted that these officials' "generalized duty to enforce state law, alone, is insufficient to subject them to a suit challenging a constitutional amendment they have no specific duty to enforce." *Id.* at 364. The court pointed out that in Oklahoma, recognition of marriages was within the administration of the judiciary rather than the executive branch of government. *Id.* at 365. Moreover, any criminal enforcement of the provision would be directed at the clerk who issued a license, not at the plaintiffs. *Id.*

Synthesizing the foregoing cases from the Tenth Circuit, *Petrella*, a case specifically addressing the governor of Kansas, suggests that the governor's constitutional law enforcement authority alone may be sufficient to satisfy *Ex Parte Young* and make her a proper defendant. *See*

10

*Animal Legal Def. Fund v. Kelly*, No. CV 18-2657-KHV, 2020 WL 362626 (D. Kan. Jan. 22, 2020), *amended*, No. CV 18-2657-KHV, 2020 WL 1659855 (D. Kan. Apr. 3, 2020) (citing *Petrella* and so holding). In that sense, the Tenth Circuit in *Petrella* apparently concluded that the Kansas governor's express constitutional responsibility for "*enforcement* of the laws" distinguished the case from *Ex Parte Young*'s admonishment that although a governor is, "in a general sense, charged with the *execution* of all [a state's] laws," that general duty is insufficient to convey jurisdiction. *Ex Parte Young*, 209 U.S. at 157 (emphasis added in both quotes). By contrast, *Bishop* stated, with respect to a suit against the governor of Oklahoma, "the Oklahoma officials' generalized duty to enforce state law, alone, is insufficient to subject them to a suit challenging a constitutional amendment they have no specific duty to enforce," *Bishop*, 333 F. App'x at 365; however, in that case the contested law was directed entirely at judicial personnel, and no member of the executive branch would ever have any role in enforcing that law with respect to the plaintiffs. *Id.* Indeed, *Kitchen* made the same observation, noting that "[o]ur holding in *Bishop* turned on the conclusion that marriage licensing and recognition in Oklahoma were within the administration of the judiciary." *Kitchen*, 755 F.3d at 1202. And *Kitchen* itself relied in part on the Utah constitution vesting its governor with the state's executive power, although *Kitchen* also looked to the governor's statutory authority and specific conduct in relation to enforcing the relevant laws in concluding that the Utah governor was subject to suit.

Taken collectively, the court concludes that an expansive reading of *Petrella* might indicate that the Kansas governor's obligation to not only execute the laws, but specifically to enforce the laws under Article I Section 3 of the Kansas Constitution, is sufficient to satisfy the requirements of *Ex Parte Young*. However, given the dearth of analysis in that case, combined with the Supreme Court's cautionary words about using a governor's general executive authority to justify

jurisdiction under *Ex Parte Young*, and the extensive statutory authority given the governor of Kansas to enforce her executive orders under the relevant statutes, the court need not read *Petrella* so broadly in this case. Rather, the court will rely on the more rigorous analysis from *Kitchen*. Accordingly, the court will consider the governor's enforcement authority under the Kansas Constitution and relevant statutes, as well as evidence of any actual or threatened enforcement.

*B. Application to Governor Kelly*

As indicated previously, the Kansas Constitution makes the governor ultimately responsible for enforcement of the laws of Kansas: "The supreme executive power of this state shall be vested in a governor, who shall be responsible for the enforcement of the laws of this state." Kan. Const. art. I, § 3. Plaintiffs' challenge in this case concerns EO 20-25, which was issued by Governor Kelly pursuant to her authority under the Kansas Emergency Management Act ("KEMA"), K.S.A. 48-904, et seq. Among other things, KEMA created a division of emergency management within the office of the adjutant general. The management, powers, duties, and functions of that division are administered by the adjutant general "under the supervision of the governor." K.S.A. 48-905a. The adjutant has various powers and duties, including to supervise and direct investigations, and report to the governor concerning any matter of public welfare related to an emergency; "to require and direct the cooperation and assistance of state and local governmental agencies and officials"; and "to do all things, not inconsistent with law, for the furtherance of emergency management activities." K.S.A. 48-907.

The act is not to be construed to affect the jurisdiction or responsibilities of police forces "other than during a declared state of disaster emergency." K.S.A. 48-923. It also does not limit the authority of the governor to declare martial law or exercise any other powers vested in the governor under the constitution, statutes, or common law. *Id.*

The act further provides in part that "[t]he governor shall be responsible for meeting the dangers to the state and people presented by disasters," and it authorizes the governor to declare a state of disaster emergency. K.S.A. 48-924(b)(1). Such a declaration ordinarily expires no later than 15 days after issuance, but it can be extended in certain circumstances. While the declaration is in effect, "the governor shall be commander-in-chief of the organized and unorganized militia and of all other forces available for emergency duty." K.S.A. 48-925(a). "The governor may issue orders and proclamations which shall have the force and effect of law" during that period. The knowing and willful violation of any lawful order issued under the act is a criminal offense.[2] Among other powers, the governor may "utilize all available resources of the state government and of each political subdivision as reasonably necessary to cope with the disaster"; "transfer the supervision, personnel or functions of state departments and agencies or units thereof for the purpose of performing or facilitating emergency management activities"; and "perform and exercise such other functions, powers and duties as are necessary to promote and secure the safety and protection of the civilian population." K.S.A. 48-925(c). The act specifically authorizes the governor to "require and direct the cooperation and assistance of state and local governmental agencies and officials." K.S.A. 49-925(c)(10). It further provides that the governor "shall exercise the powers conferred by subsection (c) by issuance of orders under subsection (b)." K.S.A. 48-925(d).

---

[2] K.S.A. 48-939 provides as follows:

> The knowing and willful violation of any provision of this act or any rule and regulation adopted by the adjutant general under this act or any lawful order or proclamation issued under authority of this act whether pursuant to a proclamation declaring a state of disaster emergency under K.S.A. 48-924 or a declaration of a state of local disaster emergency under K.S.A. 48-932, shall constitute a class A misdemeanor and any person convicted of such violation shall be punished as provided by law therefor.

Collectively, when properly invoked, the provisions of KEMA vest the governor with extensive legislative, executive, and law enforcement powers. Under K.S.A. 48-925(b), the legislature delegated a portion of its legislative power to the governor, authorizing her to enact temporary laws as authorized elsewhere in KEMA through the use of executive orders and proclamations. Similarly, in section 48-925(c), the governor's legislative powers are extended to allow suspension of certain regulatory statutes, and to essentially reorganize state departments and agencies for purposes of responding to the disaster. K.S.A. 48-925(c)(1), (3). Other provisions further enhance the governor's executive powers. *See, e.g.,* K.S.A. 48-925(a) (placing governor in command of all state militia forces and "all other forces available for emergency duty"); 48-925(c)(2) (authority to use all state and local resources to cope with disaster). However, the most relevant provisions for our purposes include K.S.A. 48-925(c)(10), authorizing the governor to "require and direct the cooperation and assistance of state and local governmental agencies and officials;" as well as section 48-925(c)(11), vesting the governor with the authority to "perform and exercise such other functions, powers and duties as are necessary to promote and secure the safety and protection of the civilian population." Undoubtedly, the plain language of section 48-925(c)(10) encompasses the ability to "require and direct" state and local law enforcement officials in ensuring compliance with the governor's executive orders issued under KEMA. Moreover, if there was any doubt about the breadth of the language in subsection (c)(10), then the sweeping general authority that she has under subsection (c)(11) would appear to authorize such enforcement activities. In fact, K.S.A. 48-934 seems to anticipate that possibility when it vests local law enforcement officers with "power, duties, and immunities" of state law enforcement officers when they engage in "maintaining or restoring the public peace or safety" during a disaster emergency.

14

In sum, the governor of Kansas is explicitly charged with enforcing state law under Article I Section 3 of the Kansas Constitution.  Moreover, in the specific context of the current declaration of disaster emergency under KEMA, the governor is authorized to not only enact laws through her use of executive orders, she is authorized to compel compliance with those laws through her power over state and local law enforcement officials and the sanctions of the criminal law.  Thus, the governor has a sufficient connection with enforcement of the relevant executive order to satisfy that element under *Kitchen* and *Ex Parte Young*.

Next, we turn to the question of whether the governor has demonstrated a sufficient willingness to enforce the offending provisions of her executive orders.  EO 20-25, which contains the challenged restriction on religious gatherings, states in a preamble that the governor's administration "will do whatever it can" to assist Kansans including by "preventing the gathering of people into groups" that could spread COVID-19.  (Doc. 33-9 at 3.)  The body of EO 20-25 contains two specific references to enforcement of the order.  One states in part that, notwithstanding EO 20-25 or 20-16, "local authorities shall retain whatever legal authority they otherwise possess to restrict or prevent access to places where people may gather in violation of" EO 20-25 or EO 20-16.  (Doc. 33-9 at 6, ¶4.)  The next paragraph provides that "[l]aw enforcement officers enforcing this order should use their discretion and consider the totality of the circumstances as they determine appropriate enforcement action." (*Id.*, ¶5.) The latter paragraph shows that the governor exercised authority by directing law enforcement officers as to how they are to enforce EO 20-25. That exercise of authority was statutorily authorized by K.S.A. 48-925(c)(10), which allows the governor to require and direct the cooperation of state and local officials during an emergency declaration.  EO 20-25 explicitly directs law enforcement officers concerning enforcement and directs them to consider all circumstances and exercise discretion.

15

The terms of the order itself show that Governor Kelly asserted authority to enforce the order. Additionally, the amended complaint alleges that after the TRO was issued in this case, the governor released a media statement indicating that the TRO only applies to the Plaintiffs and that "[a]ll other religious gatherings must continue to adhere to the requirements of EO 20-25…." (Doc. 33 at 7.) In sum, the record clearly shows that Governor Kelly has "a particular duty to enforce the [order] in question and a demonstrated willingness to exercise that duty." *Kitchen,* 755 F.3d at 1201. Accordingly, the governor is not entitled to dismissal on Eleventh Amendment immunity grounds.

The governor's arguments to the contrary are not persuasive. The governor argues that EO 20-25 "vests enforcement duties in local authorities, not the governor." (Doc. 30 at 3.) As an initial matter, the argument that EO 20-25 "vests" local authorities with enforcement duties presumes that the enforcement power was the governor's to begin with. At any rate, EO 20-25 in no way purports to divest the governor of enforcement authority. EO 20-25(4) states only that local authorities *retain* the authority *they otherwise possess* to restrict access to places where people may gather in violation of the order. And EO 20-25(5) *instructs* law enforcement officers to consider all of the circumstances and to exercise discretion when enforcing the order. That reinforces the point that the governor is specifically connected to enforcement of the order. The governor also argues that KEMA only allows the governor to issue orders and does not give her the power to enforce them. (Doc. 30 at 3-4.) But KEMA grants the governor power to issue orders directing the assistance of local officials, which would include a directive of the type in EO 20-25 on how officers should approach enforcement.

The governor further contends the Kansas Supreme Court has held that the Kansas attorney general is the chief law enforcement officer of the state, such that the attorney general, not the

16

governor, is vested with criminal law enforcement power. (Doc. 30 at 4-5.) The issue here, however, is not whether the attorney general might *also* have some particular duty to enforce the order, but whether the governor has the requisite connection. And for the reasons indicated above, the record clearly shows the governor has a particular duty and the willingness to enforce EO 20-25.[3]

**III. Defendant Kelly's Motion (or "Suggestion") to Dismiss Defendant Carr. (Doc. 36.)**

Defendant Kelly filed a document entitled "Suggestion of Lack of Subject Matter Jurisdiction over Sheriff Carr." (Doc. 30.) The document does not actually move for dismissal of Defendant Carr (who had not appeared in this action at the time the "suggestion" was filed), but "suggests" the court should dismiss Defendant Carr based on Eleventh Amendment immunity. (*Id.* at 2.)

The governor's counsel does not represent Defendant Carr and has no standing to move for dismissal on his behalf. *See EEOC v. Brooks Run Min. Co., LLC,* 2008 WL 2543545, *2 (S.D. W. Va. June 23, 2008) ("It is generally accepted that parties lack standing to seek dismissal of parties other than themselves.") Accordingly, the motion will be denied for lack of standing. The denial is without prejudice to refiling by a party with standing.

**IV. Plaintiffs' Motion to Expand TRO. (Doc. 41.)**

---

[3] The governor's suggestion that only the attorney general can direct criminal law enforcement is not supported by KEMA or by the language of EO 20-25. Moreover, the record shows that Attorney General Derek Schmidt issued a memorandum to Kansas prosecutors and law enforcement officers on April 8, 2020. (Doc. 33-4.) He concluded that the restriction on religious gatherings in EO 20-18 likely violated Kansas law, and he advised law enforcement officers to "avoid engaging in criminal enforcement" of the provision. (*Id.* at 6.) Given the allegations that a law enforcement officer warned Plaintiff Harris on April 14, 2020, that he would be subject to criminal penalties if he violated the religious gathering restriction, it is not reasonable to infer that the attorney general was directing the officer to enforce the provision.

17

Plaintiffs move to modify the terms of the TRO to apply it not only to Governor Kelly, but also to the three Defendants named in the amended complaint. (Doc. 41.) The court orally denied this motion during the status conference of April 23, 2020. As the court noted, given the existence of the TRO, Plaintiffs are unlikely to face a credible threat of harm from enforcement of EO 20-25 by the recently added Defendants. As such, no modification of the TRO is necessary. Should circumstances change, Plaintiffs are free to renew the request. The motion is accordingly denied.

### V. Conclusion

This is not a case like that envisioned in *Ex Parte Young*, in which a plaintiff, disgruntled with some new law enacted by the legislature, attacks that law by choosing the governor as a convenient defendant based on her general duty to see that the laws are faithfully executed. Instead, this is a case in which the governor has been vested with extraordinary powers to both create law and oversee its enforcement, and the governor in this case has exercised those powers in a way that Plaintiffs contend is unconstitutional toward them. Accordingly, federal jurisdiction to address those claims is proper. Defendant Kelly's arguments to the contrary are rejected.

Defendant Kelly's motion to dismiss for lack of jurisdiction (Doc. 30) is DENIED; Defendant Kelly's "suggestion" to dismiss Defendant Carr (Doc. 36) is DENIED for lack of standing; and Plaintiffs' motion to modify the TRO (Doc. 41) is DENIED.

IT IS SO ORDERED this 27th day of April, 2020, at Wichita, Ks.

_____s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE